**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ESPN ENTERPRISES, INC., a Delaware corporation; ABC CABLE NETWORKS GROUP, a California corporation; INTERNATIONAL FAMILY ENTERTAINMENT, INC., a Delaware corporation; and SOAPnet, L.L.C., a Delaware limited liability company, | Case No. 1:25-cv-07169 |
| Plaintiffs, | |
| v. | **ORAL ARGUMENT REQUESTED** |
| DISH Network L.L.C., a Colorado limited liability company, | **HIGHLY CONFIDENTIAL –** **ATTORNEYS' EYES ONLY** |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A**
**PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ......................................................................................... 1

II. BACKGROUND ......................................................................................... 5

    A.  The Pay Television Industry Is Based on Monthly Subscriptions. ........................ 5

    B.  Dish Has a Limited License to Distribute the Licensor Subscription Networks. ............................................................................................................ 7

    C.  On August 12, Dish Launches Its New Transactional Service: Day Pass. ............ 8

    D.  Licensor Quickly Objects, but Dish Refuses to Cease and Desist—Instead Scrubbing Its Website of Damaging Admissions. ................................................... 9

III. LEGAL STANDARD ................................................................................. 10

IV. ARGUMENT ............................................................................................. 11

    A.  Licensor Is Likely to Succeed on the Merits of Its Breach of Contract Claim or, at a Minimum, Has Shown Sufficiently Serious Questions on the Merits. ...................................................................................................................... 11

        1.  Element 1: The OTT License Is a Valid Contract. ...................... 11

        2.  Element 2: Licensor Has Performed Its Contractual Obligations. ........................................................................................ 11

        3.  Element 3: Day Pass Breaches the OTT License ........................ 12

            (1)  The OTT License ████████████████████████ .................................. 13

            (2)  The OTT License █████████████████ ................................ 16

            (3)  █████████████ Is Inapplicable. ......................... 19

            (4)  Incontrovertible Extrinsic Evidence Confirms That Day Pass Is Unauthorized. ................................................ 20

            (5)  Dish Also Breached the OTT License's Implied Covenant of Good Faith and Fair Dealing. ...................... 21

        4.  Element 4: Dish's Breach Damages Licensor. ............................ 22

    B.  Licensor Is Already Suffering, and Will Continue to Suffer, Irreparable Harm in the Absence of a Preliminary Injunction. ............................................... 22

    C.  The Balance of Harms Strongly Supports a Preliminary Injunction. .................. 28

    D.  A Preliminary Injunction Is Consistent With the Public Interest in Contract Enforcement. ....................................................................................................... 29

V.  CONCLUSION .......................................................................................... 29

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ADYB Engineered for Life, Inc. v. EDAN Amin. Servs. (Ireland) Ltd.*,
    2024 WL 2125431 (S.D.N.Y. May 10, 2024) (Subramanian, J.) ............................................. 12

*Austin-Spearman v. AMC Network Entm't LLC*,
    98 F. Supp. 3d 662 (S.D.N.Y. 2015) ....................................................................................... 14

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
    784 F.3d 887 (2d Cir. 2015) ..................................................................................... 10, 25, 28

*Broker Genius, Inc. v. Volpone*,
    313 F. Supp. 3d 484 (S.D.N.Y. 2018) ......................................................................... 25, 28, 29

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
    598 F.3d 30 (2d Cir. 2010) ..................................................................................................... 11

*Ellis v. Cartoon Network, Inc.*,
    803 F.3d 1251 (11th Cir. 2015) ............................................................................................. 14

*Elrod v. Burns*,
    427 U.S. 347 (1976).................................................................................................................. 27

*Evans v. Famous Music Corp.*,
    1 N.Y.3d 452 (2004) .......................................................................................................... 20, 21

*Fox Television Stations, Inc. v. FilmOn X LLC*,
    966 F. Supp. 2d 30 (D.D.C. 2013)................................................................. 5, 23, 26, 27, 28

*Gilliam v. Am. Broad. Cos.*,
    538 F.2d 14 (2d Cir. 1976) ..................................................................................................... 27

*Grandfeld II, LLC v. Kohl's Dep't Stores, Inc.*,
    83 N.Y.S.3d 66 (2d Dep't 2018).............................................................................................. 12

*Greenfield v. Philles Records, Inc.*,
    98 N.Y.2d 562 (2002) ............................................................................................................. 15

*Hughes Commc'ns India Private Ltd. v. The DirecTV Grp., Inc.*,
    71 F.4th 141 (2d Cir. 2023) .............................................................................................. 12, 18

*Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*,
    157 F. Supp. 3d 352 (S.D.N.Y. 2016) .................................................................................... 21

*JP Morgan Chase v. J.H. Elec. of N.Y., Inc.*,
    893 N.Y.S.2d 237 (App. Div. 2010)........................................................................................ 11

*Madison Ave. Leasehold, LLC v Madison Bentley Assocs. LLC*,
    811 N.Y.S.2d 47 (1st Dep't), *aff'd*, 8 N.Y.3d 59 (2006) ........................................................ 12

*MPEG LA, LLC v. Samsung Elecs. Co.*,
    86 N.Y.S.3d 4 (1st Dep't 2018)............................................................................................... 12

*Muze, Inc. v. Dig. On-Demand, Inc.*,
    123 F. Supp. 2d 118 (2000) ...................................................................................... 10, 11, 16, 26

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*N. Am.'s Bldg. Trades Unions v. Dep't of Def.,*
2025 WL 1423610 (D.D.C. May 16, 2025)........................................................ 23

*Nino v. CNBC LLC,*
2024 WL 3988827 (S.D.N.Y. Aug. 29, 2024)................................................ 14, 15

*Nuance Commc'ns, Inc. v. Int'l Bus. Machines Corp.,*
544 F. Supp. 3d 353 (S.D. N.Y. 2021) ......................................................... 13, 22

*Purdue Pharma L.P. v. Boehringer Ingelheim GmbH,*
237 F.3d 1359 (Fed. Cir. 2001) ........................................................................ 24

*Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.,*
86 N.Y.2d 685 (1995) ....................................................................................... 19

*Reda v. Eastman Kodak Co.,*
649 N.Y.S.2d 555 (4th Dep't 1996)................................................................... 16

*Register.com, Inc. v. Verio, Inc.,*
356 F.3d 393 (2d Cir. 2004) ..................................................................... 22, 23, 25

*Salinger v. Colting,*
607 F.3d 68 (2d Cir. 2010) .......................................................................... 10, 27

*Sokoloff v. Harriman Ests. Dev. Corp.,*
96 N.Y.2d 409 (2001) ....................................................................................... 22

*Stuller, Inc. v. Steak N Shake Enters., Inc.,*
695 F.3d 676 (7th Cir. 2012) ............................................................................ 24

*Ticor Title Ins. Co. v. Cohen,*
173 F.3d 63 (2d Cir. 1999) ................................................................................ 25

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,*
60 F.3d 27 (2d Cir. 1995) ............................................................................ 22, 26

*Tomhannock, LLC v. Roustabout Res., LLC,*
33 N.Y.3d 1080 (2019) ..................................................................................... 12

*Westmoreland Coal Co. v. Entech, Inc.,*
100 N.Y.2d 352 (2003) ..................................................................................... 20

**Other Authorities**

*Subscribe*, Merriam-Webster, https://www.merriam-webster.com/dictionary/subscribe............. 14

*Subscription*, Merriam-Webster, https://www.merriam-webster.com/dictionary/subscription.... 13

## I.    INTRODUCTION

Plaintiffs require a preliminary injunction to stop Defendant Dish's unauthorized sale and exploitation of Plaintiffs' most iconic, in-demand, and valuable television networks and programming.  Dish's selling of the suite of ESPN sports networks, including the SEC and ACC sports networks, as well as Disney Channel and Freeform, on a no-subscription, virtual pay-per-view basis through "passes" for a single day, weekend, or week is a flagrant violation of the agreement by which Plaintiffs licensed these networks to Dish.  That license's limited grant of rights ███████████████████████████████████████████████████████████ Monthly subscriptions from Plaintiffs' distributors are foundational to Plaintiffs' business model, because they produce predictable, sustainable revenue and viewership projections that are essential to producing and acquiring content and selling advertisements.

It is no accident that Dish calls these unprecedented offerings a "pass" and not a subscription, because they are not subscriptions.  And it is no accident that Dish planned and preemptively launched these offerings featuring Plaintiffs' networks without telling Plaintiffs in advance, much less seeking their approval.  Dish fully understood that Plaintiffs would not have approved these unauthorized passes and that they would cause substantial disruption and harm to Plaintiffs' business.  A preliminary injunction is the only remedy available to arrest this harm.

To distribute networks like ESPN, Plaintiffs enter into license agreements with companies that package their networks with other programmers' networks and distribute them to consumers, paying Plaintiffs ██████████████████████████████████████  These distributors include cable companies, direct broadcast satellite ("DBS") companies, and Internet streaming services like Dish's Sling TV.  Dish's November 23, 2022 license agreement is

referred to by the parties as the "OTT License" and attached as Exhibit A to the Declaration of Sean Breen filed herewith.[1]

On August 12—just in time for football season and with no warning to Licensor—Dish launched a brand-new, "industry-first" service: the Day Pass, Weekend Pass, and Week Pass, which we refer to collectively as "Day Pass." Dkt. 1 ¶ 22; Ex. E at 3. Day Pass allows anyone to obtain one-time access to the "Subscription Networks" on the Sling Orange service identified in the OTT License—without a subscription of any kind, much less a monthly subscription. Unlike Dish's subscription services, which automatically renew month-to-month under Dish's terms of service unless the subscriber affirmatively cancels, the Day Pass service automatically terminates at the end of the applicable day, weekend, or week.

Dish's advertising reflects that Day Pass's primary draw is transactional access to live sports, particularly football games, on the ESPN networks. For example, Dish advertised "24 hours of access to ESPN . . . *with no subscription*." Dkt. 1 ¶ 24; Ex. F at 3:



---

[1] The Breen Declaration attaches Exhibits A through D; the Declaration of Daniel M. Petrocelli attaches Exhibits E through S; and the Declaration of James M. Zasowski attaches Exhibit T. Citations to exhibits other than the OTT License refer to CM/ECF pagination. Plaintiffs have filed herewith a Request for Judicial Notice requesting that the Court take notice of Dish's public statements.

After Plaintiffs notified Dish of its breach, Dish pulled the "no-subscription" language and scrubbed other admissions from its website—but maintains that Dish is "rewriting the rules on streaming just in time for College Football" and offering "24 hours of football for $4.99," with "true pay-as-you-go instant access."  Exs. F at 8, G at 3:



Day Pass violates the plain terms of the OTT License.  Nothing in that limited grant of rights ██████████████████████████████████████████████████████████████ ████  Allowing ██████████████████████ is inconsistent with the agreement's text, structure, and purpose; irreconcilable with the parties' course of performance over decades; and incompatible with Licensor's fundamental business model that is predicated on monthly subscriptions. ████████████████████████████████████████████ ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Despite repeated requests, Dish refuses to explain how Day Pass could possibly comply with the OTT License. And after Licensor confronted Dish with a cease and desist letter, Ex. H, Dish began ridding its website of damning admissions, including its "no subscription" advertising and statements contrasting Day Pass's "One time charge" with a "Monthly subscription." Dkt. 1 ¶ 30; *compare* Ex. F at 3, *with id.* at 8; *compare* Ex. I at 3, *with id.* at 9. Whatever Dish might try to say or not say now, it cannot obscure that Day Pass is not a subscription at all, much less a monthly subscription, ████████████████████████████

███████

This is no ordinary contract dispute where after-the-fact damages could compensate Licensor for Dish's breach. Licensor needs immediate relief—its harm grows deeper every day that Day Pass stays on the market. Right now, Licensor is ████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████ But since Dish launched Day Pass, ████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████ Ex. C. ██████████████████████████████████████████████████████

---

[2] Capitalized terms are defined in the OTT License.

████████████████████████████████████████████████████████████████

████████████████████████████████████ Ex. D.

Dish is leading ever-increasing numbers of consumers to believe that they can access

Licensor's network programming, including premier college and professional football games, on

a one-off basis.  But Licensor's linear network business—its ability to finance, acquire, develop,

produce, and program content, particularly the expensive live sports content Dish is using to sell

Day Pass—████████████████████████████████████████████████.

Allowing Day Pass to remain on the market for the length of this litigation endangers the

business model that allows Dish to sell access to the ESPN networks in the first place.

Moreover, Dish's breach harms Licensor's ability to control its own intellectual property

rights and content distribution.  "[E]very court that has considered the question of whether

unauthorized Internet streaming of television and other video programming causes irreparable

harm" to television programming owners "has concluded unequivocally that it does."  *Fox*

*Television Stations, Inc. v. FilmOn X LLC*, 966 F. Supp. 2d 30, 49 (D.D.C. 2013) (granting

injunction in copyright case).  A preliminary injunction is necessary to stop this irreparable harm.

## II.    BACKGROUND

### A.    The Pay Television Industry Is Based on Monthly Subscriptions.

The chain from development of television programming to a consumer's remote control

starts with content.  Programmers like Plaintiffs either create content or license it from other

creators or rightsholders, like sports leagues.  Live sports licenses are extremely expensive.  For

example, last year, ESPN acquired a license to be the sole media rights holder for the College

Football Playoff in a reported six-year, $7.8 billion contract.  Ex. K; Zasowski Decl. ¶ 23.   That

follows a 2021 deal with the NFL in which Disney reportedly paid $2.6 billion per year for the

rights to broadcast Monday Night Football.  Zasowski Decl. ¶ 23.  Licensor's affiliated

companies similarly acquire licensing rights from the NBA, MLB, NHL, WNBA, U.S. Open Tennis Championships, and more.  *Id.* ¶ 22 & Ex. M at 6-7.

To fund these massive content investments, programmers like Plaintiffs need steady revenue streams, generated by combining content into networks, like the ESPN Network, to attract the most monthly subscribers.  *See* Zasowski Decl. ¶¶ 22-26.  Such networks are referred to as "linear" because they offer continuous content programmed to air in order at scheduled times.  The more consistent viewers a network has, the greater the revenue to the programmer, because distributors will be willing to pay a higher license fee for a popular network and advertisers will pay more to advertise their products there.



. *See* Zasowski Decl. ¶¶ 24-26.  As with the rest of the industry,

*See id.* ¶¶ 23, 26.

Programmers then license networks to distributors, such as cable or satellite companies (also called multichannel video programming distributors, or MVPDs), like Comcast, Charter, and Dish's and DIRECTV's DBS services.  *See* Breen Decl. ¶¶ 5-6.  Others, like YouTube TV, Hulu + Live TV, fuboTV, Dish's Sling TV, and DIRECTV Stream, known as virtual MVPDs, stream licensed programming networks to consumers over the Internet.  *See id.* ¶ 5.  Pursuant to license agreements with programmers, distributors group linear networks into packages they sell to consumers.  Dish, for instance, offers "Sling Orange," "Sling Blue," a combination of Orange

and Blue, and "Sling Select" services, with add-ons available. *See* Ex. I; OTT License ¶ 5(a)(i) (laying out package requirements).

**B.    Dish Has a Limited License to Distribute the Licensor Subscription Networks.**

The OTT License grants Dish limited distribution rights to stream some of Licensor's most valuable and popular television networks, including the ESPN networks and Disney Channel ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

████████████████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

████████

    █████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████

### C.    On August 12, Dish Launches Its New Transactional Service: Day Pass.

On August 12, 2025, "just in time for football season," Ex. E at 3, Dish announced its launch of Day Pass, Weekend Pass, and Week Pass. Dish advertised that this new offering, which allows consumers access to all networks in the Sling Orange service, "flipped the script on traditional streaming bundles," was the "first of its kind," and was "breaking the mold again." *Id.* ████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

Dish sold Day Pass as a way for sports fans to access football games without having to subscribe to and pay the $45.99 monthly fee for the Sling Orange service: "With college football just around the corner, our new Day Pass offering is all consumers need to win on game day, for just $4.99." Ex. E at 3 (quotation marks omitted). The press release prominently featured Licensor networks ESPN, ESPN2, ESPN3, and Disney Channel. *Id.*

Dish deliberately drew on ESPN's name recognition, brand value, and investments in live sports programming to sell Day Pass, including on its website's front page. *See* Dkt. 1 ¶¶ 5, 31. Dish told potential customers that they could get "24 hours" of ESPN with "no subscription," Ex. F at 3; customers had to pay only a "[o]ne-time charge," Ex. I at 3. Dish contrasted this with its Sling Orange "monthly subscription" service. *Id.* Its social media ads promoted "passes" to

"only pay for the games you want."[3]  Dish's Day Pass FAQs explained that "[w]hen the time

expires, you will not be charged again until the next time you order another Sling Day Pass or

subscribe to the service."  Ex. F at 5.  And an August 12, 2025 announcement posted on Dish's

website emphasized: "Best of all, you don't need to remember to cancel: When your access is up,

you won't be charged again until you purchase another Day Pass" because "Day Pass is not a

recurring charge."  Ex. J at 3.  Again, Dish emphasized that Day Pass "include[s] popular sports

channels like ESPN, ESPN2, and ESPN3," and "children's programming on Disney Channel."

*Id.*  Dish advertised that Licensor's SEC Network, ACC Network, and ESPNU could be added

for just a dollar per day.  *Id.*  Not only did Dish fail to seek Licensor's authorization for its Day

Pass offerings, it also failed to seek approval for the use of ███████████████████████

███████     *See* Breen Decl. ¶ 23; ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

**D.    Licensor Quickly Objects, but Dish Refuses to Cease and Desist—Instead
        Scrubbing Its Website of Damaging Admissions.**

When Licensor learned about Day Pass from the trade press, it promptly informed Dish

that Day Pass was not authorized under the OTT License and demanded that Dish cease and

desist.  *See* Dkt. 1 ¶¶ 28-29; Ex. H.  Dish refused, asserting that ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████     Ex. L (Aug. 22, 2025 Ltr. from E.

_____

[3] SlingTV, *Watch What You Want*, Facebook,
https://www.facebook.com/sling/videos/667917099012229; SlingTV, *Are You Guilty of
Overpaying*, Facebook, https://www.facebook.com/sling/videos/1152307053410157; RJN.

Echtman), Ex. N (Aug. 27, 2025 Ltr. from E. Echtman); Ex. Q (Sept. 9, 2025 Ltr. from E. Echtman).

After Dish received Licensor's breach letter, it began scrubbing its website of advertising that Day Pass was not a subscription. For instance, Dish removed language contrasting Day Pass's "one-time charge," with Dish's monthly "subscription" offering—although Dish is still using that language in marketing emails. *See* Dkt. 1 ¶ 30; Exs. F at 3, 8; I at 3, 9; S. Dish also revised the list of networks it prominently advertised—keeping ESPN, but replacing ESPN2, ESPN3, Freeform, and Disney Channel with other programmers' networks. *See* Dkt. 1 ¶ 31. After Licensor filed its Complaint, Dish removed the "with no subscription" language from the main Day Pass webpage. *See* Ex. F. None of these efforts to cleanse the record, however, changes how Day Pass works and that it can be purchased without a subscription.

### III.    LEGAL STANDARD

Licensor must satisfy four factors to obtain a preliminary injunction: (1) "either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor"; (2) likelihood that Licensor will "suffer irreparable injury in the absence of an injunction," specifically "the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the remedies available at law, such as monetary damages, are inadequate to compensate for that injury"; (3) that "the balance of hardships between the plaintiff and defendant . . . tips in the plaintiff's favor"; and (4) "the public interest would not be disserved by the issuance of a preliminary injunction." *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (quotation marks, citations, and alteration omitted); *see Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895-97 (2d Cir. 2015) (affirming preliminary injunction to restrain a breach of contract); *Muze,*

*Inc. v. Dig. On-Demand, Inc.*, 123 F. Supp. 2d 118, 126 (S.D.N.Y. 2000) (granting such an injunction). The first factor's "'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). Here, Licensor seeks to preserve the status quo that existed between the parties before Dish launched Day Pass. *Compare Muze*, 123 F. Supp. 2d at 126 (higher standard applies when party is attempting to alter the status quo).

## IV.    ARGUMENT

### A.    Licensor Is Likely to Succeed on the Merits of Its Breach of Contract Claim or, at a Minimum, Has Shown Sufficiently Serious Questions on the Merits.

To prevail on its breach of contract action, Licensor must establish four elements: "the existence of a contract, the plaintiff's performance under the contract, the defendant's breach of that contract, and resulting damages." *JP Morgan Chase v. J.H. Elec. of N.Y., Inc.*, 893 N.Y.S.2d 237, 239 (2d Dep't 2010).

#### 1.    Element 1: The OTT License Is a Valid Contract.

The first element is satisfied by reference to the OTT License itself. *See* OTT License.

#### 2.    Element 2: Licensor Has Performed Its Contractual Obligations.

Licensor has performed the contract by ███████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

11

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

###### 3.    Element 3: Day Pass Breaches the OTT License.

Day Pass breaches the OTT License because that license [REDACTED]

[REDACTED]

[REDACTED]

This Court's principal task in interpreting the OTT License is to carry out the parties' intent, as evidenced by the contractual language and structure.  *See Tomhannock, LLC v. Roustabout Res., LLC*, 33 N.Y.3d 1080, 1082 (2019).  The "contract should be read as a whole, with every part interpreted with reference to the whole," and "to give effect to its general purpose."  *Grandfeld II, LLC v. Kohl's Dep't Stores, Inc.*, 83 N.Y.S.3d 66, 69 (2d Dep't 2018).  The Court considers "the reasonable expectations of the parties and the business purpose to be served by their contract."  *Madison Ave. Leasehold, LLC v Madison Bentley Assocs. LLC*, 811 N.Y.S.2d 47, 53 (1st Dep't), *aff'd*, 8 N.Y.3d 59 (2006).  "Besides the common meaning of the language employed, the expectations and purposes of the parties in view of the factual context in which the agreement was made must be considered in interpreting a contract term, with due regard to the parties' sophistication."  *Id.*  Overall, the Court "seek[s] to afford the language an interpretation that is sensible, practical, fair, and reasonable."  *MPEG LA, LLC v. Samsung Elecs. Co.*, 86 N.Y.S.3d 4, 8 (1st Dep't 2018); *see ADYB Engineered for Life, Inc. v. EDAN Amin. Servs. (Ireland) Ltd.*, 2024 WL 2125431, at *7 (S.D.N.Y. May 10, 2024) (Subramanian, J.).

If the contractual language, read as a whole and in furtherance of its objectives, "is clear and unambiguous," it "must be enforced according to the plain meaning of its terms."  *Hughes*

*Commc'ns India Private Ltd. v. The DirecTV Grp., Inc.*, 71 F.4th 141, 148 (2d Cir. 2023) (quotation marks omitted). If a term is ambiguous, the Court may consider extrinsic evidence, including (1) the surrounding "acts and circumstances," (2) "conversations, negotiations and agreements prior to or contemporaneous with" execution, and (3) "the parties' course of conduct throughout the life of the contract." *Nuance Commc'ns, Inc. v. Int'l Bus. Machines Corp.*, 544 F. Supp. 3d 353, 369 (S.D.N.Y. 2021) (quotation marks and alteration omitted).

### (1)    The OTT License █████████████████████████

The OTT License's plain terms ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ The plain meaning

of "subscription" is "an arrangement for providing, receiving, or making use of something *of a continuing or periodic nature* especially on a prepayment plan."[4] "Subscribe" is similarly defined as "to receive or have access to something (such as a periodical or service) as part of an

---

[4] *Subscription*, Merriam-Webster, https://www.merriam-webster.com/dictionary/subscription (emphasis added).

arrangement to receive *a certain number of regular deliveries or a certain period of continuous access* especially by prepayment."[5]

Accordingly, "courts throughout [the Southern District of New York] have consistently held that the plain meaning of 'subscriber' requires an '*ongoing* commitment or relationship' with the service. *Nino v. CNBC LLC*, 2024 WL 3988827, at *3 (S.D.N.Y. Aug. 29, 2024) (emphasis added; quotation marks omitted) (discussing the plain meaning of "subscriber" under the Video Privacy Protection Act); *see Austin-Spearman v. AMC Network Entm't LLC*, 98 F. Supp. 3d 662, 669 (S.D.N.Y. 2015) ("Conventionally, 'subscription' entails an exchange between subscriber and provider whereby the subscriber imparts money and/or personal information in order to receive a future and recurrent benefit, whether that benefit comprises, for instance, periodical magazines, club membership, cable services, or email updates."). Other courts have recognized the same. *See, e.g.*, *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1256 (11th Cir. 2015) (collecting dictionary definitions and explaining that "'subscription' involves some type of commitment, relationship, or association (financial or otherwise) between a person and an entity").

These cases and dictionary definitions accord with everyday usage. An ordinary speaker would say, "I bought a subscription to *The New York Times*" to convey something very different from, "I bought a copy of *The New York Times*." The first invokes an ongoing commitment to periodic receipt of the paper; the second a one-time transaction. Other examples abound: a theater ticket differs from a seasonal subscription; reading an article on a writer's website differs from subscribing to her newsletter. Dish itself uses the word "Subscription" to refer to "a set

---

[5] *Subscribe*, Merriam-Webster, https://www.merriam-webster.com/dictionary/subscribe (emphasis added).

period (e.g., monthly or yearly subscription term)," which "will automatically renew on a month-to-month basis . . . unless or until they are cancelled or changed"—in contrast to Dish's "Transactional Services," which are things like "certain paid 'a-la-carte' video-on-demand rentals or pay-per-view offerings."  Ex. P at 5-6 (Sling TV Terms of Use).

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████  Licensor has every right to control and limit Dish's rights to use its valuable property.  *See Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 572 (2002) ("[I]f a contract grants less than full ownership or specifies only certain rights to use the property, then other, unenumerated rights may be retained by the grantor.").

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████  Day Pass is designed specifically to *avoid* the hallmark "ongoing commitment or relationship" that characterizes a subscription.  *Nino*, 2024 WL 3988827, at *3.  Dish has advertised the service as a "one-time charge" where customers can watch networks like ESPN "with no subscription" at all.  Exs. F, I, S.  █████████████████████

███████████████████████████████████████

15

(2)    **The OTT License** ███████████████
████████████████

The OTT License's structure and key terms ███████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

      ████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████     *See Muze*, 123 F. Supp. 2d at ("absence of any specific provision for the payment of . . . licensing fees" confirmed defendant's "breach [was] a material one"); *Reda v. Eastman Kodak Co.*, 649 N.Y.S.2d 555, 557 (4th Dep't 1996) (rejecting argument that financial-success condition did not apply to merger clause because that "narrow[] and . . .

isolat[ed]" reading would have "distort[ed] the primary purpose of" agreement, and court must "give effect to, not nullify" that purpose).  Doing so would also be inconsistent with the OTT License's ████████████████████████████████████████████████████

██████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████ *See* Ex. O (Sling TV subscriptions run at least one month).  Day Pass, however, gives customers access to the Subscription Networks for as little as one day.  ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

█████████

████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████ *See, e.g.*, *Realtime Data, LLC v.*

*Melone*, 961 N.Y.S.2d 275, 278 (2d Dep't 2013) ("Pursuant to the doctrine of 'expressio unius

est exclusio alterious,' which means that the expression of one thing is the exclusion of the

other," a provision limiting an employee's bonus to "sale of assets implies that bonus

compensation does not apply to distributions based upon something other than the sale of

assets.") (citation omitted). ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████—further underscoring why Dish's interpretation is untenable.

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

███████ Dish's interpretation again must be wrong because it would prevent these provisions

from fulfilling their purpose: ████████████████████████████████

███████ *See Hughes Commc'ns*, 71 F.4th at 151-52 (rejecting "strained interpretation" of

contractual language that was "obviously intended to cover" the circumstances at issue) (quotation marks omitted).  All of these provisions confirm that the OTT License does not authorize Day Pass.

**(3)** ███████████████ **Is Inapplicable.**

Dish may suggest that ███████████████████████████

███████████████████████████████████████

███████████████.[6]  It does not.

███████████████████████████████

███████████████████████████████████

███████████████ *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 690-91 (1995) ("if," "then" is "unmistakable language of condition" and "must be literally performed"). ███████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████



████████████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████

Dish cannot use ███████████████ as a back door to undermine the structure of the

entire OTT License. That is not only untenable █████████████████████████████

████████████████████████████████████████████████

███████████████████████████ *See, e.g., Westmoreland Coal Co. v.*

*Entech, Inc.,* 100 N.Y.2d 352, 358-59 (2003) (construing agreement "as a harmonious and

integrated whole" and rejecting interpretation that would "undermine" other provisions); *Evans*

*v. Famous Music Corp.,* 1 N.Y.3d 452, 459-60 (2004) (rejecting interpretation inconsistent with

a clause's purpose in the overall contract).

### (4) Incontrovertible Extrinsic Evidence Confirms That Day Pass Is Unauthorized.

The extrinsic evidence strongly reinforces the OTT License's plain language ███████

████████████████████████████████████████████████████

███████. The OTT License resulted from lengthy, hard-fought negotiations ██████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████

In these negotiations, █████████████████████████████████████████

█████████████████████████ *Id.* ¶ 9 & *see* Ex. B.  Nor had it raised that issue in

previous negotiations.  Breen Decl. ¶ 14.  Neither party's list of issues for negotiation ██████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████ Given the monthly subscription model's

foundational importance to Licensor's business, █████████████████████████

███████████████████████████████

██████████████████████ *Id.* ¶ 14.  It is not.  *See, e.g.*, *Evans*, 1 N.Y.3d at 459-

60 (extrinsic evidence supported music publisher's position that songwriters were not owed a

share of foreign tax credit; "when music publishing companies have shared credits . . . they have

done so pursuant to an explicit clause" and would not have assumed such an "onerous obligation

without explicitly agreeing to do so").

### (5)    Dish Also Breached the OTT License's Implied Covenant of Good Faith and Fair Dealing.

Day Pass also breaches the implied covenant of good faith and fair dealing, which

"embraces a pledge that neither party shall do anything which will have the effect of destroying

or injuring the right of the other party to receive the fruits of the contract."  *Int'l Techs. Mktg.,*

*Inc. v. Verint Sys., Ltd.*, 157 F. Supp. 3d 352, 368 (S.D.N.Y. 2016) (quotation marks omitted).

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████—would

"destroy[] the ability of [Licensor] to receive the benefit of [Dish's express promise"█

████████████████████████████████████████████████████████████

█████    *Nuance Commc'ns*, 544 F. Supp. 3d at 372; *see id.* at 373 (IBM breached implied

covenant by restructuring division to avoid creating software updates to which contracting party

would be entitled).

### 4.    Element 4: Dish's Breach Damages Licensor.

Dish's breach irreparably harms Licensor in numerous ways, both economic and non-

economic, that cannot be quantified by damages. *See infra* 22-27; *see also* Zasowski Decl. ¶¶ 9-

33; Declaration of Adam Monaco ¶¶ 9-14 (explaining types of harms caused by Dish's breach).

This harm readily establishes the fact of damage resulting from Dish's breach. *See, e.g.*, *Sokoloff*

*v. Harriman Ests. Dev. Corp.*, 96 N.Y.2d 409, 415 (2001) (plaintiff satisfies damage element by

demonstrating right to specific performance).

### B.    Licensor Is Already Suffering, and Will Continue to Suffer, Irreparable Harm in the Absence of a Preliminary Injunction.

Irreparable harm exists "where there is a threatened imminent loss that will be very

difficult to quantify at trial." *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d

Cir. 1995). The Second Circuit recognizes numerous circumstances constituting irreparable

harm, including loss of goodwill or opportunity to exercise or gain a competitive advantage, and

where quantifying damages may be speculative. *Id.* at 37-39; *Register.com, Inc. v. Verio, Inc.*,

356 F.3d 393, 404 (2d Cir. 2004) (affirming preliminary injunction in contract case; "irreparable

harm may be found where damages are difficult to establish and measure," including "loss of . . .

relationships with customers and co-brand partners"). Licensor will suffer several types of

imminent, irreparable harm from Dish's breach.

*First*, Licensor will suffer harm to its relationships with other distributors of its linear television networks.  The harm here is twofold: ██████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████ *See* Zasowski Decl. ¶¶ 11, 13;

Breen Decl. ¶¶ 24-29; Exs. C, D. ████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████ *See supra* 4;  Breen Decl. ¶¶ 25, 26, Exs. C, D.

Such "damage to [Licensor's] contractual relationships and ability to negotiate with"

█████████████████████████████████████████████ "would have far-reaching

consequences" impossible to remedy by damages.  *Fox Television Stations*, 966 F. Supp. 2d at

50-51 (issuing preliminary injunction against unauthorized television network distribution); *see*

*Register.com*, 356 F.3d at 404 (finding that a preliminary injunction was appropriate where "the

loss of Register.com's relationships with customers and co-brand partners" could not be

quantified "with any precision").  *Fox Television* is directly on point on this issue—"a sworn

declaration from a senior executive" confirms that ██████████████████████████████

████████████████████████████████████████████████ demonstrating

irreparable harm.  966 F. Supp. 2d at 50 (emphasis in original).  The "loss of bargaining power"

Licensor would suffer if Day Pass is allowed to remain on the market "cannot be restored

through damages or later litigation."  *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 2025 WL

1423610, at *13-15 (D.D.C. May 16, 2025) (enjoining policy that weakened plaintiff's

negotiating position, producing "a broader chilling effect" and "disrupting established and economically significant . . . relationships").

*Second*, and relatedly, Dish's breach undermines Licensor's overall business model, which relies on monthly subscriptions. ███████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████ *See supra* 5-6; Zasowski Decl. ¶¶ 22-28. ████████████████████████████████ — a model that would be adversely affected if transactional services like Day Pass were allowed. Monaco Decl. ¶¶ 9-14.

Even aside from effects on Licensor's distributor relationships, Dish is effectively forcing Licensor to accept new contract terms incompatible with the OTT License's underlying economics. Requiring Licensor to make "a significant change to its business model" that would "negatively affect its revenue" or make it "difficult to reestablish its previous business model without a loss of goodwill and reputation"—as Dish expressly seeks to do—constitutes irreparable harm. *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 680 (7th Cir. 2012); *see Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1368 (Fed. Cir. 2001) (in affirming S.D.N.Y. preliminary injunction, holding that "price erosion and loss of market position . . . would constitute irreparable harm").

*Third*, Dish is harming the Subscription Networks' value and brand—particularly the ESPN networks. ██████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████ *See* Zasowski Decl. ¶¶ 29-33. Day Pass, however, sets a radically lower anchor

value for three ESPN networks: $4.99 for one day, and an additional $1 per day for the SEC

Network, ACC Network, and ESPNU. Ex. J. That transactional, daily price degrades the

intrinsic value consumers place on Licensor's Subscription Networks and encourages consumers

to shift their perspective away from a recurring monthly commitment to one-time access for a

single game or other event—as illustrated by Dish's own public statements. *See* Ex. E (Dish

press release: "With college football just around the corner, our new Day Pass offering is all

consumers need to win on game day, for just $4.99."); *id.* Ex. F (advertising access to ESPN

"with no subscription").

      The longer Day Pass remains on the market, the more it damages Licensor's goodwill

among the public. Indeed, Dish is already actively attempting to inflict such harm, arguing

publicly that Day Pass is "the deal ESPN and Disney don't want you to know about," and

attacking the OTT License it agreed to as "the old guard's outdated pricing playbook." Ex. G

(quotation marks omitted); *see Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 496

(S.D.N.Y. 2018) (issuing preliminary injunction where "a perception is developing in the

industry that Broker Genius 'rips off' its customers, resulting losses to its reputation and good

will"). And according to Dish, Day Pass has "quickly gained traction and popularity." Ex. G.

      It is impossible to quantify the harm to Licensor's brands in the minds of consumers who

have begun believing that programming like Monday Night Football can and should be made

available for $4.99 per day, irrespective of how much Licensor or its affiliates have to pay for the

rights to those games or how little, if anything, Dish pays Licensor to make them available to

consumers. "[I]njunctive relief is appropriate" in such circumstances, "where it would be 'very

difficult to calculate monetary damages that would successfully redress the loss of a relationship

with a client that would produce an indeterminate amount of business in years to come.'"

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (quoting *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999)); *see Benihana*, 784 F.3d at 895-96 (affirming preliminary injunction because breach would interfere with "[c]ontrol over menu and advertising," which would harm the brand's "distinct image—a conclusion supported by common sense and the Agreement").

*Fourth*, Day Pass undermines ESPN's own new direct-to-consumer streaming service, ESPN Unlimited, launched barely a week after Day Pass and planned for many months previously. ESPN Unlimited sells monthly subscriptions, ███████████████████████████████ ██████████████████████████. *See* Zasowski Decl. ¶ 31. By offering transactional access to the ESPN networks available nowhere else, Dish undermines ESPN's "opportunity to" grow its business by attracting sports-focused subscribers. *Tom Doherty Assocs.*, 60 F.3d at 38 (awarding preliminary relief in contract dispute because, absent such relief, plaintiff would "lose an opportunity to" grow its publishing business). In *Muze*, the court applied this principle to find irreparable harm where the breaching party "exploit[ed]" Muze's intellectual property in a manner "not contemplated by the Licensing Agreement, and in a manner that is directly competitive with Muze's core . . . business." 123 F. Supp. 2d at 130. The court in *Fox Television* similarly found irreparable harm where an unauthorized Internet distributor of television networks "interfer[ed] with [networks'] proprietary and licensed online distribution avenues, such as their own websites." 966 F. Supp. 2d at 50.

Dish is distributing Licensor's networks in an unauthorized manner to compete directly and unfairly with ESPN. *See Muze*, 123 F. Supp. 2d at 131-32 (breaching party that "us[ed] Muze's property to build goodwill for itself, damaging Muze's goodwill and market position at the same time" caused irreparable harm). In fact, Dish is baselessly claiming ESPN Unlimited

(and Disney more generally) is anti-consumer in further attempts to undermine Licensor's goodwill and reputation. *See* Ex. G (contending the "old guard" like Disney is "dependen[t] on market power" and exercising "monopolistic control").

*Fifth*, this case involves Dish's unauthorized distribution of Licensor's television networks over the Internet. Such loss of control is quintessential harm not remedied by damages, as "protecting" Licensor's "right to exclude" Dish's unauthorized use of its intellectual property is difficult to accomplish "through monetary remedies." *Salinger*, 607 F.3d at 81 (emphasis omitted); *see also id.* at 82 (The "'loss of First Amendment freedoms, and hence infringement of the right not to speak . . . unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Thus, "every court that has considered the question of whether unauthorized Internet streaming of television and other video programming causes irreparable harm" to television programming owners "has concluded unequivocally that it does." *Fox Television Stations*, 966 F. Supp. 2d at 49 (quotation marks and alteration omitted); *see also id.* at 50 (where defendant had no license, finding that "a loss of control over the distribution and quality" of television networks justified preliminary injunction); *cf. Gilliam v. Am. Broad. Cos.*, 538 F.2d 14, 22 (2d Cir. 1976) (affirming preliminary injunction where licensee exceeded license's scope and thereby breached contract). Dish's conduct—distributing Licensor's networks in a manner unauthorized by any license—is conceptually no different.

Indeed, *Dish itself*, as a licensee, obtained a preliminary injunction against unauthorized distributors for these same reasons. *China Cent. Television v. Create New Tech. (HK) Ltd.*, 2015 WL 3649187, at *1, *12-13 (C.D. Cal. June 11, 2015) (finding irreparable harm because unauthorized distributors "impair[ed] plaintiffs' ability to negotiate favorable licenses" by causing "existing or prospective licensees [to] demand concessions").

C.      **The Balance of Harms Strongly Supports a Preliminary Injunction.**

The balance of harms strongly weighs in favor of an injunction.  As described, Licensor will suffer multiple types of irreparable harm if Day Pass is permitted to remain on the market.  *See supra* 22-27.

But it is "no hardship" for Dish to "refrain from" offering services "not permitted under the Agreement."  *Benihana*, 784 F.3d at 897; *Fox Television Stations*, 966 F. Supp. 2d at 51 (unlicensed television distributor had "no cognizable interest" in such unauthorized distribution).  A preliminary injunction would simply restore the status quo that has existed for years, with Dish distributing the Subscription Networks through its Sling Orange service on a monthly basis.  The current situation is of Dish's own making: had Dish consulted Licensor before launching Day Pass, the parties could have addressed their dispute.  Dish, however, took the calculated and intentional risk of ambushing Licensor with this new service.  Indeed, even though ███████ ████████████████████████████████████████████████, it remained deliberately silent about the impending launch.  Breen Decl. ¶ 19. ████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████.  If Dish prevails on the merits after trial, it can re-launch Day Pass then.  *See Broker Genius*, 313 F. Supp. 3d at 510 (harm to plaintiff's "reputation, good will, business opportunities, and customer relationships" outweighed defendant's claim that it would be "prevent[ed] from competing fully").

Moreover, Licensor remains fully within its rights to ███████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

### D.   A Preliminary Injunction Is Consistent With the Public Interest in Contract Enforcement.

The public interest is consistent with a preliminary injunction because "the public interest . . . is served by the enforcement of the parties' lawful agreement." *Benihana*, 784 F.3d at 897. Moreover, a preliminary injunction would only preserve the status quo that existed before Dish's breach. Consumers will remain able to access all the Subscription Networks on Sling TV's Orange service via monthly subscriptions, just as they have been doing for years. Whatever limited consumer interest exists in obtaining transactional access at a lower price cannot outweigh Licensor's interest in protecting its rights to this valuable intellectual property. *See Broker Genius*, 313 F. Supp. 3d at 510 (rejecting argument that "the public's interest in free competition" justified denying preliminary injunction).

## V.   CONCLUSION

The Court should issue a preliminary injunction as pleaded in Plaintiffs' Complaint enjoining Dish from continuing to offer Day Pass pending a resolution on the merits.

Dated:  September 11, 2025

Respectfully Submitted,

**O'MELVENY & MYERS LLP**


By: */s/ Daniel M. Petrocelli*

Daniel M. Petrocelli

Daniel M. Petrocelli* (lead trial counsel)
dpetrocelli@omm.com
Heather Welles*
hwelles@omm.com
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

Allen W. Burton
aburton@omm.com
1301 Avenue of the Americas, 17th Floor
New York NY 10019

Brian P. Quinn*
bquinn@omm.com
1625 Eye Street, NW
Washington, D.C. 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

* Admitted pro hac vice

*Attorneys for Plaintiffs ESPN Enterprises,
Inc. et al.*

## CERTIFICATE OF WORD COUNT (L.R. 7.1(C))

Pursuant to Local Rule 7.1(c), I hereby certify that, excluding the caption, table of contents, table of authorities, signature block, and this certificate, the foregoing Memorandum of Law contains 8,632 words, counted using the Microsoft Word program used to prepare it. It therefore complies with the word-count limitation of Local Rule 7.1(c).


Dated:   September 11, 2025                  _____*/s/ Daniel M. Petrocelli*_____

                                                            Daniel M. Petrocelli