UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ESPN Enterprises, Inc. et al., <br><br>                           Plaintiffs, <br><br> -against- <br><br> DISH Network L.L.C., <br><br>                           Defendant. | 25-cv-7169 (AS) <br><br> OPINION AND ORDER |

ARUN SUBRAMANIAN, United States District Judge:

## BACKGROUND

DISH Network offers customers access to its Sling TV platform through the "Sling Orange" service. With Sling Orange, customers can stream over the Internet a host of TV networks, including Disney networks like ESPN. While Sling Orange traditionally had only monthly subscribers, this August DISH began offering shorter-term "Sling Passes" for a day, weekend, or week. *See* Dkt. 46. Disney says that the Passes violate the parties' licensing agreement, and it wants a preliminary injunction barring their sale. For the reasons below, Disney's motion is DENIED.

## LEGAL STANDARD

"A preliminary injunction 'is one of the most drastic tools in the arsenal of judicial remedies.'" *Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 298 (S.D.N.Y. 2021) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). "It 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Id.* (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). "A party seeking a preliminary injunction must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *Id.* (quoting *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018)).

## DISCUSSION

### I. Disney has not shown a likelihood of success on the merits.

Under New York law, a breach-of-contract plaintiff "must plead and prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach." *Vista Food Exch., Inc. v. Comercial De Alimentos Sanchez S De R L De C.V.*, 147 F.4th 73, 88 (2d Cir. 2025). No one disputes the existence of the contract—the "OTT License." But Disney says the License

allows DISH to distribute its networks only through paid monthly subscriptions. Dkt. 32 at 5. That argument is unlikely to succeed.

Let's start with the text. The License, in the "Grant of Rights" section, grants DISH the right to distribute Disney's networks to "Network Subscribers" through defined "PSS Services." Dkt. 33-1 at 38–39, OTT License § 2; *id*. at 10–11, § 1. So the first question is whether Sling Orange is a "PSS Service." "PSS Service" is defined as "a video programming service . . . as part of which subscribers then-currently entitled to receive applicable linear programming networks . . . may access . . . only one stream of content at any time on a paid subscription basis." *Id*. at 28, § 1. There's more to the definition, but this is the language the parties focus on. Hearing Tr., October 22, 2025, at 20, 64.

No one disputes that as a general matter Sling Orange qualifies as a PSS Service. Hearing Tr. at 6, 13. It's a video programming service fitting all the other parts of the definition. The question is whether the reference to "paid subscription basis" moves Sling Orange out of the definition when users access it through Passes, as opposed to traditional monthly subscriptions. "Paid subscription basis" isn't defined in the contract, so Disney points to dictionary definitions and cases to support the idea that it means continuous service over a series of months, excluding the Passes at issue here. Dkt. 32 at 17–19.

But Disney overlooks the full scope of the License's Grant of Rights. As relevant here, that Grant has two parts. First it defines the types of DISH services that are covered, here "PSS Services," and then it expressly defines the subscribers to Disney's networks within those services who are authorized to receive Disney's programming. *See, e.g.*, Dkt. 33-1 at 38–39, OTT License § 2(a)(i)(A) (noting that for each "DISH PSS English Service" (that is, Sling Orange), DISH has a license to distribute Disney's networks to "Network Subscribers").

Here, when determining who the subscribers to Disney's networks through Sling Orange are, the License makes clear that it's those encompassed by the definition of "Network Subscribers." The parties didn't leave the definition of who subscribers are up to chance. They spelled it out in the contract. Indeed, Disney and DISH included *37 pages* of definitions in the License, precisely to avoid a dispute like this one arising. So that brings us to the definition of "Network Subscriber."

"Network Subscriber" is defined as a "Subscriber" "intentionally authorized by DISH" to receive the relevant network "via the Sling Platform." Dkt. 33-1 at 22–23, OTT License § 1. "Subscriber," in turn, is defined as "a person intentionally authorized by DISH to receive ***any level of video programming service or package of programming networks via the Sling Platform***." Dkt. 33-1 at 34, OTT License § 1 (emphasis added). The "Subscriber" definition continues to clarify that users of DISH's free services count as Subscribers: "For purposes of this Agreement, a person who accesses programming content via the DISH Free Service will be deemed to be a Subscriber, regardless of whether such person subscribes to a programming service, is charged a fee or has a subscription account." *Id.* at 34–35.

2

So in the "Subscriber" definition: (1) there's no minimum subscription length or other terms specified, (2) the definition includes anyone authorized to receive "any level of video programming service or package of programming networks," and (3) it even includes free-service users regardless of whether they are charged a fee, "subscribe to a programming service," or have an account. That broad definition clearly covers users of the Passes at issue in this case. Indeed, in its briefing, Disney offered no argument as to how Pass users would fall outside this definition. Nor did it explain why the "Network Subscriber" term is in the License if, as Disney argues, the License's Grant of Rights begins and ends with the undefined term "paid subscription basis" in the PSS Service definition.

At oral argument, Disney said that the purpose of the "Network Subscriber" term is solely to distinguish authorized users of the Sling platform from pirates. On this score, Disney points to the use of "intentionally authorized" in both the "Network Subscriber" and "Subscriber" definitions. Hearing Tr. at 16–17. But that doesn't explain the *rest* of the "Subscriber" definition, which makes clear that in addition to being intentionally authorized, a Subscriber is anyone who receives "any level of video programming service or package of programming networks via the Sling Platform." Nothing in that language shows an intent to limit subscribers solely to traditional monthly subscribers, language the parties could have easily inserted into this definition if they wanted to. This is enough to resolve the likelihood-of-success inquiry in DISH's favor.[1]

But even if the Court discarded the definition of "Network Subscriber," and instead looked at conventional understandings about what a "subscription" is, treating the Passes as subscriptions doesn't necessarily defy those understandings. True enough, one understanding of "subscription" is a recurring payment or agreement for multiple periods of time. *See, e.g.*, *Subscription*, Merriam-Webster Dictionary ("an arrangement for providing, receiving or making use of something of a *continuing or periodic nature*" (emphasis added));[2] *Subscription*, Cambridge Dictionary ("an amount of money that you pay *regularly* to receive a product or service" (emphasis added));[3] *see*

---

[1] The explicit inclusion of the DISH Free Service in the "Network Subscriber" definition (or "free trial[s] and preview[s]" in the "PSS Service" definition) doesn't suggest that the Passes, in contrast, aren't covered by the License. *See* Dkt. 33-1 at 28, OTT License § 1 (clarifying that offering a "limited free trial or free preview" won't "disqualify a video programming service from being a PSS Service"). As DISH observed at oral argument, clarifying that its free offerings were included in the License was necessary because it otherwise only covers "paid" subscription services. Hearing Tr. at 63–64. That's not an issue with the Passes. They are paid for, and they fit within the License's Grant of Rights, including the express definition of "Network Subscriber," which covers anyone receiving "any level of video programming service or package of programming networks."

[2] *See* https://www.merriam-webster.com/dictionary/subscription (last visited October 28, 2025).

[3] *See* https://dictionary.cambridge.org/dictionary/english/subscription (last visited October 28, 2025).

3

*also Subscriber*, Oxford English Dictionary ("a person who makes a *regular* payment . . . ." (emphasis added)).[4] But that isn't always the case.

Take, for instance, the purchase of a trial subscription to a product or service that expires at the end of the trial period. It isn't recurring, but one might reasonably think of it as a subscription. Just like the Passes, a trial user *might* decide to buy more of the product or service in the future, but she isn't obligated to do so. In this regard, DISH argues that the real hallmark of a subscription is that unlike the purchase of a thing—for example, a movie á-la-carte—a subscription gives one access for a particular time. This is consistent with the example given in Merriam-Webster, which Disney relies on. *See Subscription*, Merriam-Webster Dictionary (giving the example of a "purchase by prepayment for . . . a certain period of access to or use of something (such as an online service)"); *see also Subscription*, American Heritage Dictionary ("an agreement to receive or be given access to information or services for a specific period of time, especially over the internet").[5] Here, whether the time periods are short or not, the Sling Passes at issue are for specified periods of time, and not for specified programs or titles. For that reason, considering the Passes to be "subscriptions" doesn't necessarily conflict with conventional understandings of what that term means. To be clear, in this case the parties defined who a "Network Subscriber" is in a way that plainly includes the Passes. So the Court need not—and does not—make any findings about whether the Passes would be subscriptions absent that definition. Right now, the point in citing these dictionary definitions is that Disney's argument that subscriptions *must* be recurring over *multiple* time periods isn't necessarily right.[6]

With no further argument as to the definition of "Network Subscriber," Disney turns to the License's provisions regarding fees. DISH is required to pay Disney, with respect to each "Reporting Period" (basically every month), "monthly fees calculated" by multiplying the per-Network Subscriber rate by the number of Network Subscribers. Dkt. 33-1 at 71, OTT License § 8. Right off the bat, the reference in the License Fees section to "Network Subscribers" makes clear, contrary to Disney's argument, that this defined term governs who has access to Disney's networks. Still, Disney argues that the License's payment framework shows that the parties contemplated that, at least in the main, subscribers would be monthly in nature. But nothing in the License Fees provision purports to say that subscribers *must* contract for services for at least a month.

---

[4] *See* https://www.oed.com/dictionary/subscriber_n?tab=meaning_and_use#20093165 (last visited October 28, 2025).

[5] *See* https://ahdictionary.com/word/search.html?q=subscription (last visited October 28, 2025).

[6] Disney also points to cases under the Video Privacy Protection Act (VPPA) in which courts have concluded that a "subscriber" needs an "ongoing commitment or relationship." Dkt. 32 at 18. But that statute isn't at issue here. In any event, "[t]he VPPA does not define the term 'subscriber,'" *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1255 (11th Cir. 2015), and DISH points to various reasons why it believes the Pass users would qualify even under the VPPA, including that "Sling Pass subscribers' commitments are 'ongoing' for at least one full day, a three-day weekend or seven days." Dkt. 54 at 20–21.

4

Disney focuses on the way that License Fees are calculated. The License specifies that "[f]or purposes of calculating License Fees due . . . with respect to each Reporting Period, the number of Network Subscribers for each Subscription Network will be calculated by taking the sum of the number of Network Subscribers thereto as of the last day of the (A) Reporting Period in question and (B) immediately preceding Reporting Period, and then dividing that sum by two." Dkt. 33-1 at 71, OTT License § 8(b)(i). The "Reporting Period" spans from the "22nd day of one calendar month [to] the 21st day of the immediately following month." *Id*. at 30. Because of this formula, users of Passes who aren't subscribed on the relevant measurement dates—the 21st day of either the last month or the current one—will fall through the cracks.[7] And because the users of the Passes are signing up for a day, weekend, or week at a time only, a lot of them will fall through. That can't have been the intent of the parties, says Disney.

The parties disagree as to the purpose of the averaging mechanism. But no one suggests that before Sling Passes launched, any paying Sling customer had the choice to contract for just part of a month's worth of service. So the Court recognizes that this new offering will result in users left uncounted. Whether that's unfair or not is a hotly disputed question. Among other things, because the License's payment formula requires DISH to pay Disney a full-month license fee for active Pass users on the 21st day of a month, even though they are only signing up for a day, weekend, or a week at a time, it isn't clear that any "overpayment" for those users won't balance out the non-payment for others.[8]

But in any event, the Court can't rewrite the terms of the License—which was heavily negotiated by the parties over a series of months—to fix any potential unfairness. *See Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 570 (2002) ("[A] court is not free to alter the contract to reflect its personal notions of fairness and equity."); *Alta Partners, LLC v. Getty Images Holdings, Inc.*, 700 F. Supp. 3d 32, 47 (S.D.N.Y. 2023) ("A claim for breach of [the] covenant [of good faith and fair dealing] cannot be used to add contract terms not bargained for." (internal quotations omitted)). In this regard, *Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.*, 145 F.3d 481, 487 (2d Cir. 1998), is instructive:

> If the contract is more reasonably read to convey one meaning, the party benefitted by that reading should be able to rely on it; the party seeking exception or deviation from the meaning reasonably conveyed by the words of the contract should bear the burden of negotiating for language that would express the limitation or deviation. This principle favors neither licensors nor licensees. It follows simply from the words of the contract. The words of [DISH's] license are more reasonably read to include than to exclude [Sling Passes]. Thus, we conclude that the

---

[7] Although the License contains a proration provision, Dkt. 33-1 at 73, OTT License § 8(e), Disney says it wouldn't apply to the Passes, and DISH doesn't dispute that.

[8] In addition, DISH offers evidence that the "License Fee calculation is substantially more favorable to Disney than a daily average subscriber calculation" that includes all Pass users would be. Dkt. 54 at 15 (citing Dkt. 60 ¶¶ 11(c), 26–28). The Court doesn't need to credit that evidence to recognize that the fees mechanism doesn't lead to absurd results that would counsel departing from the plain language of the agreement.

burden fell on [Disney], if [it] wished to exclude new markets arising from subsequently developed [offerings, *e.g.*, Passes], to insert such language of limitation in the license, rather than on [DISH] to add language that reiterated what the license already stated.

*Id.* at 487.[9]

As the Court has explained, the definition of "Network Subscriber" includes anyone authorized to receive "any level of video programming service or package of programming networks," so it plainly includes Pass users. And Disney—who insists that the Passes aren't allowed—didn't insert language into the agreement to guard against them, or to make clear that subscriptions had to last for a month or more. That's so even though the parties expressly dealt in the License with other types of ephemeral offerings—like free trials and previews. Under these circumstances, Disney's recourse is to negotiate more specific language in its next license with DISH. *See Greenfield*, 98 N.Y.2d at 573 ("We realize that our conclusion here effectively prevents plaintiffs from sharing in the profits that defendants have received from [the] licensing. However sympathetic plaintiffs' plight, we cannot resolve the case on that ground under the guise of contract construction. Our guiding principle must be to neutrally apply the rules of contract interpretation because only in this way can we ensure stability in the law and provide guidance to parties weighing the risks and advantages of entering a binding agreement."). As the parties agreed at oral argument, that negotiation is around the corner, given that the License expires in less than a year and everyone agrees that the next round of negotiations will need to commence soon. Hearing Tr. at 67–69.

To be clear, the Court isn't deciding *how* DISH is required to account for Passes in the fees it owes to Disney. If DISH has structured its Passes to purposefully evade the License's payment requirements, then that could constitute either a breach of contract, or at least, breach of the implied covenant of good faith and fair dealing.[10] Those issues can be raised by Disney as this case proceeds. The only question on this motion is whether the users of Passes count as subscribers authorized to access Disney's networks in the first place. For the reasons stated above, they are. Accordingly, Disney has failed to show either a likelihood of success or "serious questions" going to the merits.

Because the License isn't ambiguous about who is counted as a subscriber, the Court doesn't delve into the extrinsic evidence put in by the parties. *See JA Apparel Corp. v. Abboud*, 568 F.3d

---

[9] Disney emphasizes the License's reservation-of-rights clause. OTT License ¶ 14(i)(i). But that clause just says that any rights not "expressly granted" to DISH are retained. Here, the parties did expressly define who "Network Subscribers" are in a way that encompasses the Passes. For that reason, the reservation clause doesn't "alter[] that analysis." *Boosey*, 145 F.3d at 488 (noting reservation clause "contributes nothing to the definition of the boundaries of the license").

[10] For example, in its briefing Disney pointed out that DISH "counts Network Subscribers for License Fee payment at 3 a.m. on the 21st of the month—but does not start Weekend Passes until 4 a.m. Friday and cuts them off at 1 a.m. Monday," to take advantage of the reporting gap. Dkt. 62 at 9 n.3. But after the parties submitted their briefs, DISH appears to have addressed this issue, "chang[ing] time parameters for the Weekend Pass on the Sling Orange service to run from 1 a.m. MT on Friday to 1 a.m. MT on Monday," so "[t]he Weekend Pass is now a full 72 hours." Dkt. 79.

390, 397 (2d Cir. 2009) ("In interpreting an unambiguous contract . . . the court is not to consider any extrinsic evidence as to the parties' intentions."). For instance, the Court doesn't consider other contracts between the parties that contained "minimum subscription length" provisions (aiding DISH's argument, given the absence of similar language here) or, on the other hand, the fact that DISH advertised its Passes as not requiring any "subscription" (aiding Disney's). Dkt. 54 at 24; Dkt. 32 at 19; *see also, e.g.*, *Dreni v. PrinterOn Am. Corp.*, 2021 WL 4066635, at *14 (S.D.N.Y. 2021) (determining that "after-the-fact statement" by defendants' employees who weren't "involved in [the parties'] contract negotiations . . . sheds no light on the parties' intent and understanding regarding the [contract] during negotiations and at the time of contracting"); *Dominick & Dominick LLC v. Deutsche Oel & Gas AG*, 2016 WL 11259075, at *9 (S.D.N.Y. Aug. 15, 2016) (holding that "after-the-fact statement cannot alter the meaning of the unambiguous Agreement"), *aff'd*, 756 F. App'x 58 (2d Cir. 2018).

And even if the License were ambiguous, this isn't a case in which the extrinsic evidence furnished by the parties is so clear that a preliminary injunction would be warranted. For instance, neither side has suggested that the issue of partial-month subscriptions or other paid-for temporary offerings were discussed in the parties' negotiations over the License and that they were either accepted or rejected. *Cf. Really Good Stuff, LLC v. BAP Investors, L.C.*, 813 F. App'x 39, 44 (2d Cir. 2020) (holding contract ambiguous and determining that the defendant's interpretation—that the contract required the plaintiff to purchase *all* or *none* of the defendant's inventory—was precluded by the parties' course of conduct, which showed that the plaintiff purchased only *some* of the defendant's inventory "on four occasions").

## II. Disney has not shown irreparable harm.

Even if Disney could show a likelihood of success on the merits, it fails to show irreparable harm warranting preliminary injunctive relief. "The irreparable harm requirement is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 80 (2d Cir. 2024) (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)). "To establish irreparable harm, the moving party must show an 'injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.'" *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*, 131 F.4th 102, 106 (2d Cir. 2025) (quoting *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020)). Disney hasn't made that showing.

Disney claims it will suffer harm to its 1) relationships with other distributors, 2) business model, 3) value and brand, 4) direct-to-consumer streaming service (ESPN Unlimited), and 5) right to exclude unauthorized distribution of its networks. Dkt. 32 at 26–35. But Disney fails to show that those alleged harms aren't speculative and that they can't be measured and remedied through money damages.

First, Disney says other distributors have already pressured Disney for similar rights. Dkt. 32 at 8; Dkt. 64 ¶¶ 16–17. But any harm from that pressure is speculative, because Disney maintains

7

that the Passes and any similar offerings aren't authorized under its licensing agreements, and it hasn't assented to *any* of those distributors' requests to offer similar products. Dkt. 41-1 ¶¶ 27–28. Relatedly, Disney hasn't alleged that it has lost business relationships with any distributors due to the Passes, and it points to no case showing that "frustration among distributors who are denied the right to distribute [television networks] on a transactional basis" is enough to show irreparable harm. Dkt. 32 at 27.

Second, Disney claims the Passes will upend Disney's "overall business model" by disrupting its "robust financial planning" and "projections and calculations based on monthly subscriptions." Dkt. 32 at 28. But Disney's evidence doesn't show that it will have to make a "fundamental change to [its] . . . business model," or will be unable to make "significant investments in content acquisition," *while this case is pending*, Dkt. 35 ¶¶ 22, 26. *See Jayaraj v. Scappini*, 66 F.3d 36, 40 (2d Cir. 1995) (considering only "the harm arising during the interim between the request for an injunction and final disposition of the case on the merits"). Similarly, Disney claims the Passes will undermine its advertising business because they make it harder to predict subscriptions, which will in turn make Disney's networks less attractive to advertisers. Dkt. 36 ¶ 9. But Disney's Executive Vice President of Ad Sales' statement that he "believe[s] that Day Pass will devalue Disney's advertising inventory and impair our efforts to sell it" does not show that advertising sales have declined or will imminently decline because of the Passes. *Id.* ¶ 10. And DISH points to testimony that the Passes may *benefit* advertising sales by increasing viewership. Dkt. 59 ¶ 6. At this stage, the Court finds that the evidence is inconclusive on that issue. And to the extent DISH invalidly sold Passes that diminish Disney's ad revenue or prevent it from acquiring content, that's something that could be measured and remedied with money damages. *See M.V. Music v. V.P. Recs. Retail Outlet, Inc.*, 653 F. Supp. 3d 31, 40–41 (E.D.N.Y. 2023) ("Courts in this Circuit have consistently held that allegations that a defendant's [actions] created an economic disadvantage and an economic loss of sales for a plaintiff are exactly the type of monetary harm [that] can be rectified by financial compensation." (internal quotations omitted)).

Third, although Disney asserts that the Passes' prices "degrade[] the intrinsic value consumers place on" Disney's networks or otherwise impair Disney's goodwill among the public, Disney hasn't offered any evidence from consumers that the Passes make them consider Disney's networks less valuable.[11] *See* Dkt. 32 at 29 (relying only on DISH's press releases and advertising materials for this point); *Atari Interactive, Inc. v. Printify, Inc.*, 714 F. Supp. 3d 225, 238 (S.D.N.Y. 2024) ("[C]onclusory statements of loss of reputation and goodwill constitute an insufficient basis for a finding of irreparable harm."); *cf. Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 496

---

[11] Disney relies on *Reuters Ltd. v. United Press Int'l, Inc.* to say its loss of goodwill is "incalculable in dollars and cents." 903 F.2d 904, 909 (2d Cir. 1990). But the court in that case focused on the fact that "terminating the delivery of a unique product to a distributor whose customers expect and rely on the distributor for a continuous supply of that product almost inevitably creates irreparable damage to the good will of the distributor." *Id.* at 907–08. That circumstance doesn't apply to Disney. If anything, it would apply to *DISH* if the preliminary injunction were granted.

(S.D.N.Y. 2018) (issuing preliminary injunction where plaintiff "credibly demonstrated that . . . a perception *is developing* in the industry that [plaintiff] 'rips off' its customers" (emphasis added)). That is, Disney hasn't shown that the Passes irreparably harm any "distinct image it has worked so hard to create in the minds of customers." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 896 (2d Cir. 2015) (affirming grant of preliminary injunction in part because district court *credited* such evidence).

Fourth, Disney's evidence doesn't show that the Passes siphon customers from ESPN Unlimited. Dkt. 35 at ¶ 33 (Disney employee stating only that he "would *expect* that Day Pass is siphoning ESPN Unlimited customers" (emphasis added)). And if the Passes *do* siphon customers from ESPN Unlimited, Disney hasn't shown that those losses would not be quantifiable. *See M.V. Music*, 653 F. Supp. 3d at 40–41.[12] On both counts, this case is different from *Muze Inc. v. Dig. On-Demand, Inc.*, 123 F. Supp. 2d 118 (S.D.N.Y. 2000). As to "actual and imminent" harm, Muze provided evidence that the defendant—without authorization—offered Muze's copyrighted content "at no charge" to one of Muze's "very significant" customers, causing that customer to remove Muze's products from its "flagship" store and "cancel[] almost $300,000 in purchase orders for" Muze's products in new stores. *Id.* at 130. And the *Muze* court emphasized that the harm stretched "broader than lost license fees and, indeed, broader than lost revenue," in part because the defendant also did not add the required proprietary-rights notices to the Muze products it was selling, "rendering futile Muze's contractual effort to foster consumer identification with its product," and "present[ing] an immediate risk of harm to Muze's reputation as a leader in its field." *Id.* at 130–31. That sort of immediate injury and reputational harm doesn't apply here, where Disney hasn't shown it has lost customers due to the Passes, and DISH isn't trying to subvert Disney's proprietary rights in the way the *Muze* defendant did.[13] The networks are being distributed in the same platform, in the same manner, that they always have, but to a broader array of Sling customers.

---

[12] Disney relies on *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27 (2d Cir. 1995), in arguing that the "loss of a concrete opportunity to grow [ESPN Unlimited] is irreparable harm," Dkt. 32 at 30. But the Court in *Doherty* found irreparable harm where, without a preliminary injunction, the plaintiff would be "unable to publish a book based on the Power Rangers" and would "lose an opportunity" to "add[] a unique product line." 60 F.3d at 38. Here, Disney has successfully launched ESPN Unlimited, and its alleged lost opportunities are speculative. Dkt. 35 ¶ 31. This case is also materially different from *Regeneron Pharms., Inc. v. United States Dep't of Health & Hum. Servs.*, where the court credited the plaintiff's "uncontested declaration . . . that it will lose existing business and new customers to competitors as a result of the [defendant], and that these customers are unlikely to return," and noted that monetary damages were unavailable because the government defendant enjoyed sovereign immunity. 510 F. Supp. 3d 29, 39–40 (S.D.N.Y. 2020). Here, monetary damages are available, and the Court does not find that Disney's (contested) declarations about potential business and customer loss justify extraordinary injunctive relief at this stage.

[13] For this reason, Disney's reliance on *Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010), is inapposite. Dkt. 32 at 31; *see CJ Prods. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 145 (E.D.N.Y. 2011) ("The *Salinger* standard for irreparable harm to plaintiff's property interest in the copyright context was based largely on the possibility of market confusion . . . .").

Fifth, it is true Disney has a right to exclude unauthorized distribution of its networks. But unlike the plaintiffs in Disney's cases, who suffered irreparable harm because they lost their ability to control their intellectual property rights and content distribution,[14] Disney retains that right in the License. That is, if Disney is correct that DISH materially breached the agreement, then Disney can seek appropriate remedies for that violation in this case, and it can exercise the termination rights available to it that are set forth in the License. Dkt. 33-1 at 80–81, OTT License § 10. That's unlike a case, such as one involving piracy, where it would be difficult to quantify harm because of the impossibility of collecting data on the number of unauthorized users. *See, e.g.*, *WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594, 620 (S.D.N.Y. 2011), *aff'd*, 691 F.3d 275 (2d Cir. 2012) ("There is no way to know how many people have used [the defendant's] rather than sanctioned methods to watch plaintiffs' programming, or how many people have used [the defendant's service] to watch programming that should not have been available.").

In this case, Disney could likely quantify its alleged harm using information that could be readily obtained: data on lost revenue and sales, if there is any, DISH's numbers concerning subscriptions and Passes, customer surveys, testimony from those in the industry, and other relevant evidence. At the very least, Disney hasn't shown at this stage that it won't be able to do what is commonplace in commercial litigation of this kind—measure and quantify its damages, using experts if need be, come trial. For these reasons, Disney hasn't shown irreparable harm.

### III.   Disney has not shown that a preliminary injunction is in the public interest or that the balance of equities favors an injunction.

"In determining whether the balance of the equities tips in the plaintiff's favor and whether granting the preliminary injunction would be in the public interest, the Court 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Two Hands IP*, 563 F. Supp. 3d at 308 (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008)). Disney's arguments on this factor rest on the assumption that it will prevail on likelihood of success and irreparable harm. Given that Disney has failed to make those showings and DISH has launched its Sling Passes product, it would be inequitable to force DISH to withdraw or change its offering while this case is ongoing. Dkt. 58 (detailing injuries to DISH if the Passes are discontinued); *Steelite Int'l U.S.A., Inc. v. McManus*, 2021 WL 1648025, at *13 (S.D.N.Y. 2021) ("Particularly because plaintiffs have not demonstrated that [defendant's] conduct is anything but legitimate competition, the public interest will be best served by denying the preliminary injunction."). To the extent that Disney demonstrates an entitlement to relief at trial, it can seek monetary damages to remedy any harm it has suffered.

---

[14] *See, e.g.*, *Fox Television Stations, Inc. v. FilmOn X LLC*, 966 F. Supp. 2d 30, 49–50 (D.D.C. 2013) (finding irreparable harm where the plaintiff could not prevent the defendant's piracy of its networks, and the defendant "would likely be unable to pay" money damages if the plaintiff prevailed); *Muze*, 123 F. Supp. 2d at 129–32 (finding irreparable harm where the plaintiff validly terminated its licensing agreement, but the defendant continued to use the plaintiff's product without authorization or attribution).

## CONCLUSION

For the reasons stated above, Disney's motion for a preliminary injunction is DENIED. Disney's unopposed motion for judicial notice, Dkt. 37, is GRANTED.

The Clerk of Court is directed to terminate Dkts. 26 and 37.

SO ORDERED.

Dated: November 17, 2025
New York, New York

ARUN SUBRAMANIAN
United States District Judge