**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ESPN ENTERPRISES, INC.; ESPN, INC.; ABC CABLE NETWORKS GROUP; AMERICAN BROADCASTING COMPANIES, INC.; FX NETWORKS, LLC; INTERNATIONAL FAMILY ENTERTAINMENT, INC.; NGC NETWORK US, LLC; SOAPnet, L.L.C.; WABC TELEVISION (NEW YORK), LLC; WPVI TELEVISION (PHILADELPHIA), LLC; KABC TELEVISION, LLC; KFSN TELEVISION, LLC; KGO TELEVISION, INC.; KTRK TELEVISION, INC.; WLS TELEVISION, INC.; and WTVD TELEVISION LLC, | Civil Action No. 1:25-cv-07169-AS-BCM |

Civil Action No.

1:25-cv-07169-AS-BCM

**DISH NETWORK L.L.C.'S ANSWER AND DEFENSES TO AMENDED COMPLAINT AND COUNTERCLAIMS**

**REDACTED**

*Plaintiffs*,

-against-

DISH NETWORK L.L.C.,

*Defendant.*

DISH NETWORK L.L.C.,

*Defendant/Counterclaim Plaintiff,*

-against-

ESPN ENTERPRISES, INC.; ESPN, INC.; ABC CABLE NETWORKS GROUP; AMERICAN BROADCASTING COMPANIES, INC.; FX NETWORKS, LLC; INTERNATIONAL FAMILY ENTERTAINMENT, INC.; NGC NETWORK US, LLC; and SOAPNET, L.L.C.,

*Plaintiffs/Counterclaim Defendants,*

and

THE WALT DISNEY COMPANY; BABY NETWORK LIMITED; FUBOTV INC.; and FUBOTV MEDIA INC.,

*Counterclaim Defendants.*

# ANSWER

Defendant DISH Network L.L.C. ("DISH") hereby responds to the Amended Complaint dated December 19, 2025 as follows:

## "NATURE OF THE ACTION"

1.      In response to Paragraph 1, DISH admits that the "OTT Licensor" Plaintiffs seek an injunction and damages in this action and otherwise denies the allegations.

2.      In response to Paragraph 2, DISH admits that it has an over-the-top digital license with the "OTT Licensor" Plaintiffs that authorizes DISH to distribute the "OTT Licensor" Plaintiffs' programming as part of DISH's streaming Sling TV service, and otherwise denies the allegations and respectfully refers the Court to the OTT License for a complete and accurate statement of its terms.

3.      In response to Paragraph 3, DISH admits that it launched Sling Passes (including the Day Pass, Weekend Pass and Week Pass), an "industry-first" offering, on August 12, 2025. DISH further admits that it did not consult the OTT Licensor Plaintiffs in advance of launching Sling Passes, and avers that it had no contractual obligation to consult the OTT Licensor Plaintiffs prior to launching Sling Passes. In addition, DISH admits that a limited number of promotional materials for Sling Passes included the phrase "with no subscription," which was inaccurate. DISH otherwise denies the allegations in Paragraph 3 and respectfully refers the Court to Exhibit E to the Amended Complaint for a complete and accurate statement of its contents.

4.      In response to Paragraph 4, DISH denies the allegations.

5.      In response to Paragraph 5, DISH denies the allegations, and avers that it has learned that YouTube TV has a non-renewing 20-minute free preview offering that allows

consumers to "Watch for 20 minutes free with no commitment.  If you like what you see, start a free trial."

6.      In response to Paragraph 6, DISH denies the allegations.

7.      In response to Paragraph 7, DISH admits that Exhibit G to the Amended Complaint states "popular sports channels like ESPN, ESPN2, and ESPN3" are among the 34 channels that can be streamed with the new Day Pass by Sling.  DISH otherwise denies the allegations in Paragraph 7 and respectfully refers the Court to Exhibits G and H to the Amended Complaint for a complete and accurate statement of their contents.

8.      In response to Paragraph 8, DISH admits that Exhibit I to the Amended Complaint states that "Sling's recent court win reinforces its mission to reinvent television by championing consumer choice and flexibility.  The Sling Day, Weekend and Week Pass subscriptions offer access to live sports, entertainment and news without a long-term contract, giving customers pay-as-you-want, instant access to top live channels at affordable prices." DISH otherwise denies the allegations in Paragraph 8 and respectfully refers the Court to the OTT License for a complete and accurate statement of its terms.

9.      In response to Paragraph 9, DISH denies the allegations.

10.     In response to Paragraph 10, DISH denies the allegations.

11.     In response to Paragraph 11, DISH admits that it refused to cease and desist from offering Sling Passes and that Plaintiffs seek an injunction and damages in this action, and otherwise denies the allegations.

12.     In response to Paragraph 12, DISH admits that Exhibit B to the Amended Complaint is a DBS License between DISH and the DBS Licensor Plaintiffs and that Exhibit C to the Amended Complaint is an RCA License between DISH and the RCA Licensor Plaintiffs.

DISH otherwise denies the allegations and respectfully refers the Court to the OTT License, the DBS License and the RCA License for a complete and accurate statement of their terms.

**"PARTIES"**

13.      In response to Paragraph 13, DISH admits that Plaintiffs are parties to license agreements with DISH.  DISH denies Plaintiffs' characterization of those licenses, and respectfully refers the Court to those licenses for a complete and accurate statement of their terms.  Except as specifically admitted, DISH denies the allegations in Paragraph 13.

14.      In response to Paragraph 14, DISH admits that the OTT Licensor Plaintiffs are parties to the OTT License with DISH and that certain of OTT Licensor Plaintiffs' television networks and content are carried on the Sling Orange service, for which DISH offers Sling Passes.  DISH denies Plaintiffs' characterization of the OTT License, and respectfully refers the Court to the OTT License for a complete and accurate statement of its terms.  DISH otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 14 concerning the states of incorporation and principal places of business of the OTT Licensor Plaintiffs.  Except as specifically admitted, DISH denies the allegations in Paragraph 14.

15.      In response to Paragraph 15, DISH admits that the DBS Licensor Plaintiffs are parties to a DBS License with DISH.  DISH denies Plaintiffs' characterization of the DBS License, and respectfully refers the Court to the DBS License for a complete and accurate statement of its terms.  DISH otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15 concerning the states of incorporation and principal places of business of the DBS Licensor Plaintiffs.  Except as specifically admitted, DISH denies the allegations in Paragraph 15.

16.     In response to Paragraph 16, DISH admits that the RCA Licensor Plaintiffs are parties to an RCA License with DISH, and respectfully refers the Court to the RCA License for a complete and accurate statement of its terms.  DISH otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16 concerning the states of incorporation and principal places of business of RCA Licensor Plaintiffs.  Except as specifically admitted, DISH denies the allegations in Paragraph 16.

17.     In response to the first and second sentences in Paragraph 17, DISH denies that its name is "DISH Network LLC" (which is missing the periods in "L.L.C.") and otherwise admits the allegations.  In response to the third sentence in Paragraph 17, DISH admits that it is a counterparty to the OTT License, the DBS License, and the RCA License, denies the accuracy of Plaintiffs' description of those agreements, and respectfully refers the Court to the OTT License, DBS License and RCA License for a complete and accurate statement of their terms.

## "JURISICTION AND VENUE"

18.     In response to Paragraph 18, DISH admits that this Court has subject matter jurisdiction over this action.  DISH further admits that it is a citizen of Colorado.  DISH lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning the citizenship of each Plaintiff entity.

19.     In response to Paragraph 19, DISH denies the allegations and denies that Plaintiffs have suffered any harm or injury.

20.     In response to Paragraph 20, DISH admits that this Court has personal jurisdiction over it for purposes of this action.

21.     In response to Paragraph 21, DISH admits that venue is proper in this Court.

**"LICENSOR'S VALUABLE TELEVISION PROGRAMMING AND DISTRIBUTION LICENSES"**

22.    In response to the first and third sentences in Paragraph 22, DISH lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and on that basis denies the allegations.  In response to the second sentence in Paragraph 22, DISH admits the allegations.

23.    In response to the first and second sentences in Paragraph 23, DISH admits the allegations.  In response to the third sentence in Paragraph 23, DISH lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and on that basis denies the allegations.

24.    In response to Paragraph 24, DISH denies the allegations.

25.    In response to Paragraph 25, DISH denies the allegations.

26.    In response to Paragraph 26, DISH denies the allegations.

27.    In response to Paragraph 27, DISH denies the allegations.

28.    In response to Paragraph 28, DISH admits that it has had license agreements with certain Plaintiffs applicable to its direct broadcast satellite service over the course of decades, and otherwise denies the allegations.

29.    In response to Paragraph 29, DISH admits that it negotiated the OTT License with representatives of the OTT Licensor Plaintiffs in 2022 and otherwise denies the allegations.

30.    In response to Paragraph 30, DISH admits that Seth VanSickel states in his Declaration dated September 29, 2025, "[i]nternally at DISH, we had been considering an offering along the lines of Sling Passes for approximately two years.  In Spring 2025, we started moving toward making Sling Passes a reality," and otherwise denies the allegations.

31.     In response to the first sentence of Paragraph 31, DISH lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning Plaintiffs' license agreements with other entities, and on that basis denies the allegations.  In response to the second sentence of Paragraph 31, DISH denies the allegations.  In response to the third sentence of Paragraph 31, DISH lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and on that basis denies the allegations.

### "DISH ANNOUNCES UNAUTHORIZED 'DAY PASS' OFFERING"

32.     In response to Paragraph 32, DISH admits that it publicly announced Sling Passes on August 12, 2025 with a press release that contains the quoted language and that the retail price for a Sling Orange baseline monthly subscription is $45.99.  DISH respectfully refers this Court to the August 12, 2025 press release for a complete and accurate statement of its contents.  DISH otherwise denies the allegations in Paragraph 32.

33.     In response to Paragraph 33, DISH admits that Exhibit G to the Amended Compliant contains the quoted language, and otherwise denies the allegations.  DISH avers that Sling Passes are subscriptions.

34.     In response to Paragraph 34, DISH denies the allegations and respectfully refers the Court to the OTT License for a complete and accurate statement of its terms.

35.     In response to Paragraph 35, DISH denies the allegations and respectfully refers the Court to the Frequently Asked Questions on the Sling website for a complete and accurate statement of its contents.

36.     In response to Paragraph 36, DISH admits that Sling Passes provide subscribers with access to the Sling Orange service, and otherwise denies the allegations.

37.     In response to the first sentence of Paragraph 37, DISH admits that it did not consult with the OTT Licensor Plaintiffs before announcing and offering Sling Passes, and

otherwise denies the allegations.  In response to the second sentence of Paragraph 37, DISH lacks knowledge or information sufficient to form a belief as to how the OTT Licensor Plaintiffs learned of Sling Passes, and on that basis denies the allegations.  In response to the third sentence of Paragraph 37, DISH admits that Deadline published an article about Sling Passes, respectfully refers the Court to that article for a complete and accurate statement of its contents, denies the accuracy of the quoted statement in the Deadline article, and otherwise denies the allegations.  In response to the fourth sentence of Paragraph 37, DISH denies that it made any false representations to a Deadline reporter and otherwise denies the allegations.  In response to the fifth sentence of Paragraph 37, DISH admits that it did not consult with Plaintiffs in advance of launching Sling Passes, and otherwise denies the allegations.

38.    In response to the first sentence of Paragraph 38, DISH denies the allegations.  In response to the second sentence of Paragraph 38, DISH admits that it refused to cease and desist from offering Sling Passes, and otherwise denies the allegations.

39.    In response to Paragraph 39, DISH denies the allegations.

40.    In response to Paragraph 40, DISH denies the allegations.

41.    In response to the first sentence of Paragraph 41, DISH admits that the OTT Licensor Plaintiffs filed their original Complaint in this Court, along with a request that the Complaint be filed under seal, on August 26, 2025.  In response to the second sentence of Paragraph 41, DISH admits that the original Complaint identified certain promotional materials inaccurately stating "no subscription," and otherwise denies the allegations.  In response to the third sentence of Paragraph 41, DISH denies the allegations.

42.    In response to Paragraph 42, DISH admits that it revised a website FAQ response and otherwise denies the allegations.

43.    In response to Paragraph 43, DISH admits that it updated its Terms of Use to address Sling Passes and otherwise denies the allegations.

44.    In response to the first sentence of Paragraph 44, DISH denies the allegations.  In response to the second sentence of Paragraph 44, DISH admits that Kurt Simon states in his Declaration dated September 29, 2025 that DISH "intended to differentiate the Sling Passes offering from the standard monthly streaming subscriptions that are familiar to consumers.  That standard streaming subscription offering requires pre-payment on a monthly basis and auto-renews from month-to-month," as well as "[a]side from the inartful use of the phrase 'with no subscription,' the Sling Passes marketing materials accurately describe the terms and features of Sling Passes," and otherwise denies the allegations.

## "DISH CONTINUES TO CAPITALIZE ON DAY PASS'S UNAUTHORIZED AND UNIQUE MARKET ADVANTAGE"

45.    In response to Paragraph 45, DISH denies the allegations.

46.     In response to the first sentence of Paragraph 46, DISH lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and on that basis denies the allegations.  In response to the second and third sentences of Paragraph 46, DISH denies the allegations.

47.    In response to Paragraph 47, DISH admits that the Sling account on the X platform posted the content shown in the embedded screen-shot in Paragraph 47, respectfully refers the Court to that post for a complete and accurate statement of its contents, and otherwise denies the allegations.

48.    In response to Paragraph 48, DISH admits that the Sling account on the X platform reposted the content shown in the embedded screen-shot in Paragraph 48, respectfully

refers the Court to those reposts for a complete and accurate statement of their contents, and otherwise denies the allegations.

49.      In response to Paragraph 49, DISH admits that it used its social media channels to promote Sling Passes, and respectfully refers the Court to those channels for a complete and accurate statement of their contents.  DISH otherwise denies the allegations in Paragraph 49.

50.      In response to Paragraph 50, DISH admits that it reposted certain comments on the X platform on November 8, and respectfully refers the Court to those reposts for a complete and accurate statement of their contents.  DISH otherwise denies the allegations in Paragraph 50.

51.      In response to Paragraph 51, DISH admits that it does not pay License Fees to the OTT Licensor Plaintiffs for Day Pass customers who do not subscribe to Sling Orange on the 21st day of the month, and otherwise denies the allegations.

52.      In response to Paragraph 52, DISH admits that it issued the press release attached to the Amended Complaint as Exhibit I and that it ran a limited-time promotion for $1 Day Passes from November 19 through November 30, 2025.  DISH further admits that it advertised its limited-time Day Pass promotion on the Sling website.  DISH respectfully refers the Court to Exhibit I, Exhibit L and Exhibit M for a complete and accurate statement of their contents, and otherwise denies the allegations in Paragraph 52.

**"DAY PASS BREACHES DISH'S LIMITED LICENSE TO DISTRIBUTE OTT SUBSCRIPTION NETWORKS ON A MONTHLY SUBSCRIPTION BASIS"**

**"Sling Orange Does Not Qualify as a 'PSS Service' for Day Pass Users."**

53.      In response to Paragraph 53, DISH respectfully refers the Court to the OTT License for a complete and accurate statement of its terms, denies that it is a "limited license" and that its foundation "is the standard monthly subscription model," and otherwise denies the allegations to the extent that they vary from the terms of the OTT License.

54.     In response to Paragraph 54, DISH respectfully refers the Court to the OTT License for a complete and accurate statement of its terms, and otherwise denies the allegations.

55.     In response to Paragraph 55, DISH respectfully refers the Court to the OTT License for a complete and accurate statement of its terms, and otherwise denies the allegations.

56.     In response to Paragraph 56, DISH respectfully refers the Court to the OTT License for a complete and accurate statement of its terms, and otherwise denies the allegations.

57.     In response to Paragraph 57, DISH respectfully refers the Court to the OTT License for a complete and accurate statement of its terms, and otherwise denies the allegations.

58.     In response to Paragraph 58, DISH denies the allegations.

**"The OTT License Includes No Payment Mechanism for Day Pass."**

59.     In response to Paragraph 59, DISH respectfully refers the Court to the OTT License for a complete and accurate statement of its terms, and otherwise denies the allegations.

60.     In response to Paragraph 60, DISH respectfully refers the Court to the OTT License for a complete and accurate statement of its terms, and otherwise denies the allegations.

61.     In response to Paragraph 61, DISH respectfully refers the Court to the OTT License for a complete and accurate statement of its terms, and otherwise denies the allegations.

62.     In response to Paragraph 62, DISH respectfully refers the Court to the OTT License for a complete and accurate statement of its terms, and otherwise denies the allegations.

63.     In response to Paragraph 63, DISH respectfully refers the Court to the OTT License for a complete and accurate statement of its terms, and otherwise denies the allegations.

64.     In response to Paragraph 64, DISH denies the allegations.

65.     In response to Paragraph 65, DISH admits that it revised the time parameters for the Weekend Pass on October 23, 2025 to begin at 1 a.m. MT on Fridays, and otherwise denies the allegations.

66.     In response to Paragraph 66, DISH respectfully refers the Court to the OTT License for a complete and accurate statement of its terms, and otherwise denies the allegations.

**"The OTT License's Reporting and Audit Provisions Confirm Day Pass Is Unauthorized."**

67.     In response to Paragraph 67, DISH denies the allegations.

68.     In response to Paragraph 68, DISH respectfully refers the Court to the OTT License for a complete and accurate statement of its terms, and otherwise denies the allegations.

69.     In response to Paragraph 69, DISH respectfully refers the Court to the OTT License for a complete and accurate statement of its terms, and otherwise denies the allegations.

70.     In response to Paragraph 70, DISH denies the allegations.

71.     In response to Paragraph 71, DISH admits that it produced Sling Pass data in connection with the preliminary injunction motion filed in this action and that the data was produced as Highly Confidential – Attorneys' Eyes Only under the Protective Order in this action.  DISH further admits that it received a December 1, 2025 request from Plaintiffs' counsel for production of additional Sling Pass data and for DISH to downgrade its production of Sling Pass data to "Confidential."  Except as specifically admitted, DISH denies the allegations in Paragraph 71.

72.     In response to Paragraph 72, DISH admits that it declined to produce additional Sling Pass data in response to the letter request from Plaintiffs' counsel and that "[t]he OTT License's reporting obligations do not include daily sales data."  Except as specifically admitted, DISH denies the allegations in Paragraph 72.

**"OTT Licensor Did Not Authorize DISH to Use Licensor Marks in Its Day Pass Materials."**

73.     In response to Paragraph 73, DISH respectfully refers the Court to the OTT License for a complete and accurate statement of its terms, and otherwise denies the allegations.

74.    In response to Paragraph 74, DISH respectfully refers the Court to the OTT License for a complete and accurate statement of its terms, and otherwise denies the allegations.

75.    In response to Paragraph 75, DISH admits that it has used "Licensor Marks" (as defined in the OTT License) in marketing and advertising materials for Sling Passes, respectfully refers the Court to those materials for a complete and accurate statement of their contents, and otherwise denies the allegations in Paragraph 75.

76.    In response to Paragraph 76, DISH denies the allegations.

77.    In response to Paragraph 77, DISH denies the allegations.

**"DISH IS IN BREACH OF THE OTT LICENSE, DBS LICENSE, AND RCA LICENSE BECAUSE IT HAS REPEATEDLY FAILED TO TIMELY PAY LICENSE FEES"**

78.    In response to Paragraph 78, DISH respectfully refers the Court to the OTT License, the DBS License, and the RCA License for a complete and accurate statement of their terms, and otherwise denies the allegations.

79.    In response to Paragraph 79, DISH respectfully refers the Court to the OTT License, the DBS License, and the RCA License for a complete and accurate statement of their terms, and otherwise denies the allegations.

80.    In response to Paragraph 80, DISH respectfully refers the Court to the referenced MFN offer and DISH's response thereto for a complete and accurate statement of the relevant contractual amendment and otherwise denies the allegations.

81.    In response to Paragraph 81, DISH denies the allegations.

82.    In response to Paragraph 82, DISH denies the allegations.

83.    In response to Paragraph 83, DISH denies the allegations

**"DISH'S UNLICENSED DISTRIBUTION OF THE SUBSCRIPTION NETWORKS IS CAUSING NUMEROUS FORMS OF HARM"**

84.    In response to Paragraph 84, DISH admits that Sling Passes are a new and innovative consumer-friendly offering and otherwise denies the allegations.

85.    In response to the first sentence of Paragraph 85, DISH denies knowledge or information sufficient to form a belief as to the truth of the allegations concerning "OTT Licensor's business," and on that basis denies the allegations in that Paragraph.  DISH denies the remainder of the allegations in Paragraph 85.

86.    In response to Paragraph 86, DISH denies the allegations.

87.    In response to Paragraph 87, DISH denies the allegations.

88.    In response to Paragraph 88, DISH denies the allegations.

89.    In response to Paragraph 89, DISH denies the allegations.

90.    In response to Paragraph 90, DISH denies the allegations.

91.    In response to Paragraph 91, DISH denies the allegations.

92.    In response to Paragraph 92, DISH admits that the launch of ESPN Unlimited played a role in DISH's decision-making around Sling Passes, and otherwise denies the allegations.

93.    In response to Paragraph 93, DISH denies the allegations.

**"COUNT I: BREACH OF CONTRACT"**

**"Brought by Plaintiffs ESPN Enterprises, Inc., ABC Cable Network Group, International Family Entertainment, Inc. and SOAPnet, L.L.C. Against DISH"**

94.    DISH incorporates its responses to the allegations in the foregoing Paragraphs as if fully set forth herein.

95.     In response to Paragraph 95, DISH admits that the OTT License is a binding contract and that DISH and the OTT Licensor Plaintiffs are parties to the OTT License, and otherwise denies the allegations.

96.     In response to Paragraph 96, DISH denies the allegations.

97.     In response to Paragraph 97, DISH denies the allegations.

98.     In response to Paragraph 98, DISH denies the allegations.

99.     In response to Paragraph 99, DISH denies the allegations.

100.    In response to Paragraph 100, DISH denies the allegations.

101.    In response to Paragraph 101, DISH denies the allegations.

**"COUNT II: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING"**

**"Brought by Plaintiffs ESPN Enterprises, Inc., ABC Cable Network Group, International Family Entertainment, Inc. and SOAPnet, L.L.C. Against DISH"**

102.    DISH incorporates its responses to the allegations in the foregoing Paragraphs as if fully set forth herein.

103.    In response to Paragraph 103, DISH admits that the OTT License is a binding contract and that DISH and the OTT Licensor Plaintiffs are parties to the OTT License, and otherwise denies the allegations.

104.    In response to Paragraph 104, DISH denies the allegations.

105.    In response to Paragraph 105, DISH denies the allegations.

106.    In response to Paragraph 106, DISH denies the allegations.

107.    In response to Paragraph 107, DISH denies the allegations.

108.    In response to the first sentence of Paragraph 108, DISH admits that its retained expert Aaron Yeater stated in a Declaration dated September 30, 2025 that "there are no historical data to understand variation with respect to Sling Passes specifically," respectfully

refers the Court to Mr. Yeater's Declaration for a complete and accurate statement of its contents, and otherwise denies the allegations.  In response to the second sentence of Paragraph 108, DISH admits that it declined to produce additional Sling Pass data in response to a December 1, 2025 letter request from Plaintiffs' counsel, respectfully refers the Court to Exhibit O to the Amended Complaint for a complete and accurate statement of its contents, and otherwise denies the allegations.  In response to the third sentence of Paragraph 108, DISH denies the allegations.

109.    In response to Paragraph 109, DISH denies the allegations.

110.    In response to Paragraph 110, DISH denies the allegations.

## "COUNT III: BREACH OF CONTRACT (FAILURE TO PAY)"

### "Brought By All Plaintiffs Against DISH"

111.    DISH incorporates its responses to the allegations in the foregoing Paragraphs as if fully set forth herein.

112.    In response to Paragraph 112, DISH admits the allegations.

113.    In response to Paragraph 113, DISH denies the allegations.

114.    In response to the first sentence of Paragraph 114, DISH respectfully refers the Court to the OTT License, DBS License, and RCA License, each as amended, for a complete and accurate statement of their terms, and otherwise denies the allegations.

115.    In response to Paragraph 115, DISH denies the allegations.

116.    In response to Paragraph 116, DISH denies the allegations.

## <u>DEFENSES</u>

### First Defense

### FAILURE TO STATE A CLAIM

The Amended Complaint fails to state a claim as a matter of law.

**Second Defense**

**WAIVER AND ESTOPPEL**

Plaintiffs, through prior conduct, communications and/or course of performance, waived or are estopped from asserting each of the causes of action alleged in the Amended Complaint.

**Third Defense**

**SETOFF**

Any recovery by Plaintiffs must be reduced, in whole or in part, by operation of the doctrine of setoff.

**Fourth Defense**

**FAIR USE**

Defendant's use of Plaintiffs' marks is protected under the doctrine of fair use.

**Fifth Defense**

**UNCLEAN HANDS**

Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands.

**Sixth Defense**

**MATERIAL BREACH**

Plaintiffs' claims are barred, in whole or in part, by Plaintiffs' material breach of contract.

**<u>ADDITIONAL DEFENSES</u>**

By designating the aforementioned defenses, DISH does not in any way waive or limit any defenses which are or may be raised by its denials and averments.  These defenses are pleaded in the alternative, and are raised to preserve DISH's rights to assert these defenses, and are without prejudice to DISH's ability to raise other and further defenses.  DISH expressly reserves all rights to re-evaluate its defenses and/or assert additional defenses upon discovery

and review of additional documents and information, upon the development of other pertinent

facts, and/or during pretrial proceedings in this action.

## <u>COUNTERCLAIMS</u>

Defendant/Counterclaim-Plaintiff DISH alleges as follows:

1.      Disney is far more powerful than the cute mouse logo suggests: as part of the

price for must-have sports content that many DISH customers actually want, Disney requires

DISH and its video customers to pay hundreds of millions of dollars every year in excess fees for

content that DISH's customers do not watch.  To carry ESPN, DISH must cram its packages with

less-popular networks such as ███████████████████.  The reason why DISH must

capitulate to Disney's demands is simple: without ESPN, DISH stands to lose a substantial

portion of its customers.  And this is only part of the treasure that Disney has exacted from DISH

by misuse of its market power.  Disney, both an upstream supplier to DISH and DISH's

downstream competitor, also prevents DISH from offering its own version of the skinny sports

network packages that Disney is distributing directly to subscribers itself.

2.      Disney, meanwhile, continues both having and eating its cake.  The defections

from DISH to other distribution outlets, including Disney's, do not mean that DISH makes lower

payments to Disney for its sports programming: because of Disney's packaging and penetration

requirements, DISH must continue to charge its remaining customers for ESPN, whether they

watch it or not, even if many sports enthusiasts have left DISH for Disney's distribution arms.

3.      Disney more or less says to consumers: "if you like my sports, Football Frank,

come to my own distribution platforms, whether the ESPN/FOX One bundle, or Fubo Sports;

you will get them cheaper and without the cost of additional non-sports networks, a tailored

package that I have prohibited DISH, Sling TV, and other distributors from offering.  If you do

not like my sports, Sitcom Sally, stay with DISH or Sling; but, if you do stay, you will still have to pay for my sports programming whether you want it or not." Heads, Disney wins; tails, Disney wins too; either way, DISH and its customers lose.

4.      The past year has seen three attempts by Disney to create a distribution platform at the expense of its own distributors (and their customers) by providing the skinny sports bundles that Disney prohibits these distributors from offering. The first was stopped by this court; the other two are off-the-ground and running.

5.      Disney first attempted a joint venture with partners Fox and Warner Bros. Discovery ("WBD"), euphemistically called Venu in public and, with more candor, Raptor internally. This court said "no" to Raptor/Venu in a preliminary injunction issued in the *Fubo* case, partly based on the "bundling requirements" Disney imposed on distributors trying to compete against the joint venture. Then Disney settled the case by buying the plaintiff, Fubo, and supposedly abandoned the disallowed Raptor/Venu joint venture. But this appears to have been a feint: soon Disney proceeded to reconstruct not one, but two platforms that are Raptor/Venu's close doppelgangers. One is the ESPN/FOX One bundle, an alliance between Disney and fellow sports magnate Fox (without the third erstwhile Raptor/Venu partner, WBD, which has since lost its most valuable sports rights). The other not only mirrors the outlawed Raptor/Venu; adding mockery to injury, it is named Fubo Sports, after the co-opted plaintiff that had obtained the preliminary injunction against Raptor/Venu in the first place. Here, Disney partners with Fox and CBS. Both the ESPN/FOX One bundle and Fubo Sports proudly feature Disney's sports networks *without* the low-value networks, such as ███████████████, that Disney forces all other distributors to sell to their sports customers.

6. Disney's "deep pockets" can buy settlements and plaintiffs; but they cannot buy facts and they cannot extinguish the anticompetitive "bundling requirements" already castigated by this court, requirements that prevent rival distributors (like DISH) from competing with Disney's skinny sports bundles.

7. Disney's conduct gives rise to manifold antitrust violations. First, Disney has engaged in tying its must-have networks to less-popular ones, a *per se* violation of Section 1 of the Sherman Act and the New York Donnelly Act; second, Disney has coordinated with Fox in creating not just one but two skinny sports bundles—the ESPN/FOX One bundle and Fubo Sports—an unreasonable restraint of trade under Section 1 of the Sherman Act; third, Disney's acquisition of distribution outlet Fubo has substantially lessened competition by allowing Disney to provide the skinny sports bundles that Disney prohibits anyone else from offering, thereby monetizing Disney's contractual restrictions—a violation of Section 7 of the Clayton Act; and fourth, Disney has attempted to monopolize the downstream skinny sports bundle market by banning other pay television distributors from offering Disney's content to consumers in the same consumer-friendly way as Disney itself does, in violation of Section 2 of the Sherman Act.

8. DISH is party to contracts with certain Disney entities that authorize DISH to distribute Disney networks to DISH's customers. There is one contract applicable to DISH's Sling TV service, referred to herein as the "OTT License." There is another contract applicable to DISH's direct broadcast satellite ("DBS") service, referred to herein as the "DBS License." There is an additional contract applicable to retransmission of Disney's owned and operated ABC broadcast stations, referred to herein as the "Retrans License." Certain terms in the DBS License apply on a cross-platform basis, with applicability to the DBS and Sling platforms collectively. All of the licenses contain certain Most Favored Nation ("MFN") provisions.

9.     In addition to the antitrust violations described above, the Disney entities that are counterparties to the OTT License and the DBS License (hereinafter, the "Licensors") have flagrantly breached their MFN obligations to DISH.

**PARTIES**

10.     Defendant/Counterclaim-Plaintiff DISH is a Colorado limited liability company with its principal place of business in Colorado.  Its sole member is DISH DBS Corporation, which is incorporated in Colorado, with its principal place of business in Colorado.

11.     Counterclaim-Defendant The Walt Disney Company ("TWDC") is incorporated in Delaware with its principal place of business in California.  TWDC has numerous affiliates that are parties to the OTT and DBS Licenses.

12.     Plaintiff/Counterclaim-Defendant ESPN Enterprises, Inc. is incorporated in Delaware with its principal place of business in Connecticut.  ESPN Enterprises, Inc. is a party to the OTT and DBS Licenses.

13.     Plaintiff/Counterclaim-Defendant ESPN, Inc. (collectively with ESPN Enterprises, Inc., "ESPN") is an affiliate of TWDC, incorporated in Delaware with its principal place of business in Connecticut.  ESPN, Inc. is a party to the DBS License.

14.     Plaintiff/Counterclaim-Defendant ABC Cable Networks Group is incorporated in California with its principal place of business in California.  ABC Cable Networks Group is a party to the OTT and DBS Licenses.

15.     Plaintiff/Counterclaim-Defendant American Broadcasting Companies, Inc. is incorporated in Delaware with its principal place of business in New York.  American Broadcasting Companies, Inc. is a party to the OTT and DBS Licenses.

16.     Counterclaim-Defendant Baby Network Limited is a private limited company incorporated in London with its principal place of business in London.  Baby Network Limited is a party to the OTT and DBS Licenses.

17.     Plaintiff/Counterclaim-Defendant FX Networks, LLC is a Delaware limited liability company with its principal place of business in California.  The sole member of FX Networks, LLC is TFCF Cable Networks, LLC, which is a Delaware limited liability company with its principal place of business in California.  The sole member of TFCF Cable Networks, LLC is Disney Networks Group, LLC, which is a Delaware limited liability company with its principal place of business in California.  The sole member of Disney Networks Group, LLC is TFCF Entertainment Group, LLC, which is a Delaware limited liability company with its principal place of business in California.  The sole member of TFCF Entertainment Group Holdings, LLC is TFCF America, Inc.  TFCF America, Inc. is a Delaware corporation with its principal place of business in California.  FX Networks, LLC is a party to the OTT and DBS Licenses.

18.     Plaintiff/Counterclaim-Defendant International Family Entertainment, Inc. is incorporated in Delaware with its principal place of business in California.  International Family Entertainment, Inc. is a party to the OTT and DBS Licenses.

19.     Plaintiff/Counterclaim-Defendant NGC Network US, LLC is a Delaware limited liability company with its principal place of business in the District of Columbia.  The sole member of NGC Network US, LLC is National Geographic Partners, LLC, which is a Delaware limited liability company with its principal place of business in New York.  The members of National Geographic Partners, LLC are TFCF International Channels (US) Inc., TFCF-NGC (International) Holdings, Inc., and TFCF-NGC (US) Holdings, Inc., each of which are

incorporated in Delaware with a principal place of business in California, and NGSP, Inc., which is incorporated in Delaware with a principal place of business in the District of Columbia. NGC Network US, LLC is a party to the OTT and DBS Licenses.

20.     Plaintiff/Counterclaim-Defendant SOAPnet, L.L.C. is a California limited liability company with its principal place of business in California. The sole member of SOAPNet, L.L.C. is ABC Cable Networks Group, which is incorporated in California with its principal place of business in California. SOAPnet, L.L.C. is a party to the OTT and DBS Licenses.

21.     Counterclaim-Defendants fuboTV Inc. and FuboTV Media Inc. (collectively, "Fubo") are Florida corporations with their principal places of business in New York.

22.     Except where context otherwise requires, references in these Counterclaims to "Defendants" or "Disney" are to all Counterclaim-Defendants other than Fubo. References in these Counterclaims to "Licensors" are to the parties to the OTT and/or DBS Licenses: ESPN, Inc.; ESPN Enterprises, Inc., ABC Cable Networks Group, American Broadcasting Companies, Inc., Baby Network Limited, FX Networks, LLC, International Family Entertainment, Inc., NGC Network US, LLC, and SOAPnet, L.L.C., collectively.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over the federal law antitrust counterclaims under 28 U.S.C. §§ 1331 and 1337(a), and 15 U.S.C. §§ 15 and 26.

24.     This Court has subject matter jurisdiction over the state law counterclaims, pursuant to 28 U.S.C. § 1332(a)(1), based on complete diversity of citizenship between DISH and the Defendants and the fact that the amount in controversy exceeds $75,000 exclusive of interests and costs.

25.     This Court also has supplemental jurisdiction over the state law counterclaims, pursuant to 28 U.S.C. § 1367(a).

26.     The Plaintiffs/Counterclaim Defendants in this action consented to personal jurisdiction by filing suit in this Court.  This Court also has personal jurisdiction over all Licensors by consent pursuant to Paragraph 14(a) of the OTT License and Paragraph 14(a) of the DBS License, both of which provide that any dispute related to the agreements ███████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

███████████████████████[1]

27.     This Court has personal jurisdiction over Disney because this action arises out of Disney's activity in the State of New York.  Disney's executives with responsibility for negotiating license agreements with DISH and other Pay-TV distributors for carriage of Disney's television networks work in Disney's New York City offices.

28.     This Court also has personal jurisdiction over American Broadcasting Companies, Inc. and Fubo because their principal places of business are in the Southern District of New York.

29.     Venue is proper in this Court pursuant to Paragraph 14(a) of the OTT License and Paragraph 14(a) of the DBS License, as set forth above, and 28 U.S.C. § 1391(b).  A substantial part of the events giving rise to the Counterclaims occurred in this judicial district.

---

[1] Material that is Confidential pursuant to the Protective Order (Dkt. 11) has been highlighted in blue.

## FACTS

### I.    TIMELINE

30.    Here is the relevant timeline of Disney's three attempts to destroy competition in violation of antitrust law—one thwarted, two continuing:

- February 6, 2024: Disney announces a joint skinny sports bundle, Venu Sports, with Fox and WBD;

- August 16, 2024: At the request of Fubo, this court enjoins Raptor/Venu's launch as a likely violation of antitrust laws;

- January 6, 2025: Disney settles the *Fubo* litigation by agreeing to buy Fubo. Simultaneously, Disney and Fox enter into new distribution agreements with Fubo;

- January 10, 2025: The three Raptor/Venu partners announce the supposed abandonment of that venture;

- August 11, 2025: Disney announces the ESPN/FOX One bundle in partnership with Fox; it is described by an observer as "basically Venu minus Warner Bros. Discovery";

- August 28, 2025: Fubo announces the second Raptor/Venu lookalike, Fubo Sports, featuring Disney's, Fox's, and CBS's sports content; Fubo Sports fulfills what Fubo's president described as "the potential to create skinnier sports . . . bundles according to consumer needs."  In other words, Raptor/Venu redux;

- October 29, 2025: Disney completes its acquisition of Fubo.

31.    In the hands of Disney, everything old, and outlawed, becomes new again.  Both Fubo Sports and the ESPN/FOX One bundle are transparent attempts to circumvent the rationale underlying the *Fubo* court's decision and monopolize the skinny sports bundle market for itself and its direct competitor Fox.

### II.    DISNEY IS BOTH A MAJOR SUPPLIER OF SPORTS PROGRAMMING TO DISTRIBUTORS AND A DISTRIBUTOR

32.    When an American consumer turns on a screen to watch live sports, a web of companies interacts to create, package, and distribute that event to the consumer.  Historically,

this Pay-TV ecosystem had three levels: At the top level, sports leagues (such as the NFL and MLB) organize live sporting events and sell the media rights to their events to programmers via long-term license agreements.  At the intermediate level, programmers (such as Disney) acquire the media rights to popular sporting events, produce televised broadcasts of those games on networks owned by the programmers (such as ESPN), and license the distribution rights to those networks to distributors.  At the bottom level, distributors (such as DISH/Sling TV, DirecTV, Comcast/Xfinity, Charter/Spectrum, Fios TV, and YouTube TV) license linear networks from programmers and distribute subscription packages that include those networks directly to consumers.  Distributors that use cable, fiber, or satellite infrastructure are the traditional Multichannel Video Programming Distributors ("MVPDs"), whereas newer distributors that offer television content over the Internet (e.g., Sling TV, YouTube TV, Disney-owned Hulu + Live TV, and Fubo) are sometimes called "Online Video Distributors" (or "OVDs," and, with MVPDs, "Pay-TV Distributors").

33.    DISH is a distributor that offers packages of linear video programming services to consumers throughout the United States via satellite (a traditional MVPD service) and the Internet via Sling TV (an OVD service).  Launched in 2015 and 2016, respectively, Sling's core services, Sling Orange and Sling Blue, provide distinct lineups.  Orange includes ESPN and ESPN2 (and included ESPN3 until discontinued in December 2025, as set forth below at ¶ 89), but is also required by Disney to include ████████████████████████.  Blue, for its part, features Fox and NBC, and is required by Disney to include ███████████████████████ ████████████████████████████████████.  Sling Orange is a personal subscription license, and therefore can only be made available to a subscriber as a single stream.  In other words, within a household, it can only be watched on one TV or device at a

time.  Sling Blue is a multi-stream product, meaning that a subscribed household can watch it on three TVs or devices at a time.

34.    Sling also provides Sling Select, a multi-stream offering that includes 11 mostly entertainment-focused networks; Sling is required by Disney to include ██████████ ████████████████████████████████████████████████████████████████████. Neither Sling Blue nor Sling Select includes Disney's ESPN, whose must-have popularity is explained below, ████████████████████████████████████████████ ███████████████████████████████████████████.

35.    By virtue of the ESPN/FOX One and Fubo Sports bundles, as well as its other direct-to-consumer offerings, Disney itself has become a distributor of content directly to consumers.  The twin "hats" give Disney the ability and the incentive to favor its own distribution outlets over those of DISH and other Pay-TV Distributor competitors and potential competitors.

36.    DISH desires to participate in the market for distributing skinny sports bundles, which is dominated by ESPN/FOX One and Fubo Sports, but has so far been prevented from doing so, in large part because of the unlawful tying requirements exacted by Disney.

## III.    DISNEY EXTRACTS BILLIONS OF DOLLARS IN SUPRACOMPETITIVE PROFITS THROUGH ANTICOMPETITIVE BUNDLING PRACTICES

37.    Disney's anticompetitive tying requirements have lined its pockets with billions in supra-competitive profits at the expense of distributors and consumers.  The tying exacted by Disney takes several forms that complement one another:

- ***Bundling***: To carry ESPN and other Disney sports content, DISH is also required to carry networks such as the ██████████████████████████ ██████████, depending on the platform (satellite or Sling) and package;

- ***Penetration/Pay-on***: DISH must ensure that a minimum percentage of its customers receive Disney's non-sports content, or pay Disney subscriber fees for "phantom subscribers," meaning customers who do not even receive Disney programming. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████; and

- ***Packaging***: DISH must not only carry the panoply of unwanted or little-wanted networks identified above; ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

38.    Under this anticompetitive regime, a sports fan who cares only about ESPN still must buy a package including, for example, cooking and teen sitcom networks.  Effectively, the sports fans pay for culinary content of no interest to them.  In addition, while ESPN is extraordinarily powerful because of its content and the number and enthusiasm of sports fans who cannot do without it, and serves as Disney's principal sword in its tying strategy, not every pay-TV customer is a sports fan.  No matter: because of the extraordinary attraction of ESPN to sports fans, cooking fans must pay for it, too, even when they do not watch it.  Football Frank pays for ██████; Sitcom Sally pays for ESPN alongside Football Frank.  Everyone loses, except Disney.

39.    This combination of provisions means that Disney makes it impossible to create a skinny sports bundle.  In fact, almost every package available to DISH customers must be large and/or pricey, because Disney content must be in it, and/or because Disney must be paid on more customers than those who actually receive or watch its content.

40.     Other distributors, too, have repeatedly objected to the anticompetitive nature of these bundling requirements: In 2023, Charter lamented that Disney was "forcing customers to take their products, even when they don't want or can't afford them."[2]  And satellite provider DirecTV alleged in 2024 that "Disney has insisted on a 'fat bundle' of networks, forcing the carrier to offer less popular programming while Disney provides consumers with cheaper, 'skinnier' packages."[3]  As one observer noted: "The distributors have been begging for the right to offer cheaper and skinnier bundles, especially bundles that would segregate expensive sports from cheaper non-sports programming, for at least two decades, and they've been met with a brick wall."[4]

## IV.    THE UNIQUE IMPORTANCE OF LIVE SPORTS TELEVISION CONTENT AND DISNEY'S DOMINANCE OVER IT

41.     This behavior is made possible due to Disney's commanding lock over the most popular live sports programming.  Live sports, more than any other form of entertainment, is "the principal driver of TV viewership."[5]  Twenty-seven of the thirty most-watched broadcasts of all time have been live sporting events.  Accordingly, many live sports are "must-have," commercially critical content for any video distributor seeking to attract and retain such consumers.

---

[2] Press Release, Charter Communications, *Charter Communications Provides Update on Negotiations with the Walt Disney Company* (Sept. 1, 2023), https://corporate.charter.com/newsroom/charter-communications-provides-update-on-negotiations-with-the-walt-disney-company.

[3] *See DirecTV Files FCC Complaint against Disney for Anti-Competitive Practices*, CNBC (Sept. 8, 2024), https://www.cnbc.com/2024/09/08/directv-disney-espn-fcc-complaint-filed-for-anticompetitive-practices.html.

[4] Daniel Frankel, *Pay TV Companies, and the DOJ, Push Back on Big 'Spulu' Sports Streaming Joint Venture*, Next TV (Feb. 15, 2024), https://www.nexttv.com/news/pay-tv-companies-privately-push-back-on-big-spulu-sports-streaming-joint-venture.

[5] *TV Timeout: Understanding Sports Media Rights*, Hearing Before the Subcomm. On Commc'ns and Tech., 118th Cong. at 15:15 (2024) (statement of Rep. Doris Matsui), *available at* https://www.congress.gov/event/118th-congress/house-event/116779.

42.     As of 2025, Disney accounts for roughly 28% of all U.S. spending on sports broadcast rights, the highest share of any company.[6]  Disney controls the television rights to a staggering array of the most popular sports leagues and events in the United States.  As shown by the non-exhaustive list that follows, the sun hardly ever sets on Disney's sports empire:

43.     *National Football League*: ESPN controls NFL's Monday Night Football, several playoff games, the Super Bowl (self-produced every four years), and other NFL events.  And, under a pending transaction with the NFL, ESPN is also set to acquire the NFL Network (which will air seven regular season NFL games per season), as well as the right to distribute and negotiate on behalf of the NFL RedZone network (which shows highlights from all NFL games happening simultaneously).

44.     *College Football*: ESPN controls the media rights to the majority of FBS collegiate football conferences, including three of the "Power 4" collegiate football conferences: ACC (including broadcasts on the ACC Network), SEC (including broadcasts on the SEC Network), and Big 12 (split with Fox), and other FBS conferences including AAC, C-USA, Sunbelt, and MAC.  It also licenses the College Football Playoffs (including the National Championship), numerous major conference championship games, and other major rivalry and bowl games.  Finally, it licenses the rights to the majority of FCS collegiate conferences (*e.g.*, Ivy League, Big Sky, and Southland), with many such games being broadcast on ESPN+.

45.     *National Basketball Association*: ESPN and Disney-owned ABC control the rights to about 35% of all nationally televised regular-season games, as well as a significant number of games in the Playoffs and Finals, as well as other NBA events.

---

[6] Lucas Manfriedi, *Sports Rights Untangled: Here's What Every Media and Tech Giant Owns*, The Wrap, (Sept. 4, 2025), https://www.thewrap.com/sports-rights-list-who-owns-what-youtube-disney-netflix/.

46.    ***Major League Baseball***: Through 2025, ESPN licensed the rights to significant regular season MLB games, numerous MLB playoff games, and other MLB events.  ESPN and MLB have recently concluded a new deal for the 2026-28 seasons, making ESPN the exclusive rights holder for MLB.TV, which airs thousands of out-of-market games each year.

47.    ***National Hockey League***: ESPN licenses the rights to well over 100 exclusive regular season games, over 1,000 regular season games available exclusively on ESPN+ via NHL Power Play, numerous Stanley Cup Playoffs games, the Stanley Cup Finals (in even-numbered years), and other NHL content.

48.    ***College Basketball***: ESPN is the largest broadcaster of men's and women's college basketball, including major conferences such as the Big 12, SEC, and ACC, as well as mid-major and smaller conferences.  As noted above, ESPN owns the ACC Network and the SEC Network.  ESPN airs half of the men's basketball conference tournaments during Championship Week in the run-up to the March Madness tournament.

49.    ***Golf and Tennis***: ESPN licenses exclusive rights to broadcast portions of two of the major events on the PGA Tour—all four rounds of the PGA Championship (split with CBS), as well as the first two rounds of The Masters.  In tennis, ESPN has broadcast rights to three major championships—Wimbledon, the U.S. Open, and the Australian Open.

50.    ***College Championships***: ESPN licenses the exclusive rights to 40 different NCAA championships across a broad array of sports, including the Women's Basketball NCAA Tournament and the Men's and Women's College World Series.

51.    Sports fans generally do not have the choice of switching to subscription video-on-demand streaming ("SVODs") services.  The mystery of a game's outcome lasts only while the game is live—particularly in the social media age where results and replays are spread

instantly throughout the world.  For this reason, while general entertainment consumers have fled the linear bundle for the Netflixes of the world over the past several years, sports fans remain, at least for now.  This means that, today, sports fans make up a historically high percentage of Pay-TV customers; yet Disney still requires them to receive and pay for general entertainment networks.

52.    Sports content is the most expensive content sold to distributors (and, by extension, consumers).  And the costliest of the costly by far is Disney's ESPN.  ESPN charges distributors fees ████████████ higher than the most expensive non-sports cable network.

53.    Video distributors agree to pay these high license fees, as further compounded by the penetration, packaging and pay-on restrictions that conjure up additional fees based on phantom viewers, only because they have no other option.  Video distributors that fail to carry live sports cannot attract or retain the many customers who demand this programming.  Sports fans care enough to switch providers if their current video distributor stops carrying their favorite teams' games.  DISH would suffer a subscriber exodus threatening its very existence as a Pay-TV Distributor if it stopped offering ESPN.

54.    Bob Iger, CEO of Disney, has expressly acknowledged the importance of Disney's marquee ESPN Network: "You cannot launch a new multichannel platform or bundle successfully without ESPN.  The numbers would be not even close to what they'd be with ESPN."[7]  ESPN often has the most-watched primetime sports content in the nation.  As of the

---

[7] David Lieberman, *Bob Iger Says He Feels "Great" About ESPN's Long-Term Prospects*, Deadline (May 18, 2016), https://deadline.com/2016/05/disney-bob-iger-feels-great-about-espn-long-term-prospects-1201758719/.

spring of 2025, Nielsen-rated ESPN sports networks accounted for 36% of sports viewing nationwide.[8]

## V.    DISNEY TRIES TO DOMINATE THE SKINNY SPORTS BUNDLE MARKET

### A.  Disney's First Attempt to Corner Televised Live Sports with Fox: Venu Sports

55.    In 2024, Disney resolved to do itself what it prohibited all distributors from doing: create, and dominate, the Skinny Sports Bundle Market, initially in coordination with its competitor in the Sports Programming Market, Fox.

56.    Although dwarfed by that of Disney, Fox's sports rights portfolio is also substantial.  In March 2021, Fox announced an 11-year agreement with the NFL for the rights to National Football Conference games.  According to its Executive Chairman, Fox's ability to broadcast numerous NFL games every year is "the foundation of [Fox's] marquee sports portfolio."[9]

57.    The Department of Justice has recognized the combined power that Disney and Fox wield over televised live sports, calling Disney and Fox "two of the country's most valuable cable sports properties."[10]

58.    In spring 2023, Disney and Fox agreed on a joint venture in which Disney and Fox would combine their substantial sports holdings to offer Disney and Fox sports content in a package exclusive to them that would be totally unbundled with any other, non-sports content.

---

[8] Press Release, ESPN, *ESPN Earns Its Best Nielsen Q1 Viewership Since 2017, Further Cementing a Stellar Start to 2025* (Apr. 15, 2025), https://espnpressroom.com/us/press-releases/2025/04/espn-earns-its-best-nielsen-q1-viewership-since-2017-further-cementing-a-stellar-start-to-2025/.
[9] Press Release, Fox Corporation, *Fox Corporation Announces New Eleven-Year Media Rights Agreement with the National Football League* (Mar. 18, 2021) https://www.foxcorporation.com/news/corp-press-releases/2021/fox-corporation-announces-new-eleven-year-media-rights-agreement-with-the-national-football-league/.
[10] *United States v. The Walt Disney Co.*, No. 18-cv-5800, Doc. 21, Competitive Impact Statement (S.D.N.Y. filed Aug. 7, 2018).

They later added a third large programmer to their proposed joint venture—WBD, which at that time owned exclusive NBA rights.  With alarming candor, Disney, Fox, and WBD codenamed their joint venture "Raptor."

59.    In February 2024, Disney, Fox, and WBD publicly announced their joint venture, branded externally and more euphemistically as "Venu Sports."  Raptor/Venu would have assembled a standalone "skinny" sports bundle unlike anything that these programmers had ever permitted any distributor to offer.  It was slated to launch in fall 2024 at a price of $42.99 per month, featuring 14 major sports channels—including ESPN, ESPN2, ESPNU, SEC Network, ACC Network, ESPNEWS, the ABC and Fox local broadcast stations, FS1, FS2, Big Ten Network, TNT, TBS and truTV— alongside ESPN+ streaming content.  Disney, Fox, and WBD each took a one-third ownership stake in Raptor/Venu, underscoring the unprecedented cooperation among these rivals to consolidate U.S. sports rights on one platform.

60.    Unsurprisingly, the Raptor partners did not relax the contractual restrictions that force DISH to bundle sports with non-sports programming.

**B.  The Court Blocks the Launch of Raptor/Venu**

61.    Distributors, consumers, and government antitrust enforcers immediately raised concerns after the joint venture's announcement.  The DOJ announced that it was investigating Raptor/Venu as a potential violation of antitrust laws, and several U.S. lawmakers wrote a letter to the FCC and DOJ warning of Raptor/Venu's anticompetitive effects: "[t]his massive new sports streaming company would be poised to control more than 80% of nationally broadcast sports and more than half of all national sports content, putting it in a position to exercise monopoly power over televised sports," while "the market power of its three giant parent

companies would enable it to discriminate against competitors and increase prices for consumers."[11]

62.     One distributor, then-independent Fubo, went further.  On February 22, 2024, it filed suit in this District challenging Disney's joint venture as a violation of the federal antitrust laws, and sought a preliminary injunction to block the launch.  *FuboTV Inc. v. Walt Disney Co.*, 1:2024-cv-01363 (S.D.N.Y.) ("*Fubo*").

63.     On August 16, 2024, following expedited discovery and a hearing, the court granted a preliminary injunction against the launch of Raptor/Venu, finding that Fubo was likely to prove the Raptor/Venu joint venture violated antitrust laws.  In a 69-page ruling, Judge Garnett concluded that Raptor/Venu would "exercise near-monopolistic control" over sports streaming and substantially lessen competition."  *FuboTV Inc. v. Walt Disney Co.*, 745 F. Supp. 3d 109, 116 (S.D.N.Y. Aug. 16, 2024).  Together, Disney, Fox and WBD were found to "collectively own at least 60% of all nationally broadcast U.S. sports rights"—nearly 75% of the rights to the most-watched leagues (NFL, NBA, MLB, NHL, NCAA football)—giving Raptor/Venu enormous market power.  The court cited as "crucial context" the defendants' history of forcing Pay-TV Distributors to buy sports networks bundled with entertainment networks.  Raptor/Venu's structure would allow Disney, Fox and WBD to unbundle their sports for themselves alone, after years of denying any other distributor that same opportunity.

64.     The court identified multiple ways in which Raptor/Venu's formation would likely harm competition.  Among other things, each JV member had agreed not to license their sports content directly to consumers outside of Raptor/Venu, a non-compete provision that

---

[11] Letter from Sen. Elizabeth Warren *et al.* to Jonathan Kanter, DOJ, and Jessica Rosenoworcel, FCC (Aug. 6, 2024), *available at* https://www.warren.senate.gov/imo/media/doc/warren_castro_letter_to_doj_and_fcc_re_sports_streaming_jv.pdf.

would foreclose any rival sports-only platform for at least three years.  In fact, internal projections showed that Raptor/Venu, after starting from a temptingly low price, was committed to a bait-and-switch strategy, planning to raise consumer prices roughly 10% each year after launch.  The court agreed that Raptor/Venu would have the power to *block out* other distributors and quickly dominate the market.

65.    The likely result, the court found, would be higher prices and fewer choices for consumers, and severe harm to competitors like Fubo (which warned that Raptor/Venu could siphon "hundreds of thousands" of its subscribers and drive it into insolvency).  In granting the injunction, Judge Garnett concluded that "Fubo and American consumers will face irreparable harm in the absence of an injunction" blocking Raptor/Venu's launch.

**C.  Disney Buys Its Way Out of the Raptor/Venu Injunction by Buying Fubo**

66.    Disney ended the preliminary injunction entered in *Fubo*, and the entire *Fubo* litigation, by buying off, and buying, the plaintiff.  Among other things, Disney agreed to acquire Fubo, Disney guaranteed Fubo a loan of $145 million, and the Raptor/Venu partners paid Fubo $220 million.  Concurrently, Disney amended its programming licensing agreement with Fubo, apparently dropping restrictive bundling requirements that it continued to impose on DISH and other distributors.  On information and belief, Fox also amended its own licensing agreement with Fubo.  Disney planned to offer, and is now offering, Fubo alongside, but separately from, its Hulu + Live TV offering, giving Disney approximately 6 million customers in the distribution market between those two services.  The transaction closed on October 29, 2025.

67.    In a letter filed in the *Fubo* docket, DISH urged the court to not "allow[] a party with a deep pocket to eliminate precedent it dislikes simply by agreeing to a sufficiently lucrative

settlement to obtain its adversary's cooperation."[12]  The court did nothing to disturb its precedent and the holdings of *Fubo* remain valid.

68.     Disney and its partners scuttled Raptor/Venu three days later.[13]  But Raptor/Venu would not prove Disney's last attempt to monopolize sports distribution.  Efforts to recreate Raptor/Venu dressed in different garb followed.

### D.  Disney's Second Attempt to Corner Televised Live Sports with Fox: the ESPN/FOX One Bundle

69.     Publicly, Disney claimed defeat in the wake of the *Fubo* ruling, announcing that it would abandon the joint venture.  Internally, however, Disney was already trying to snatch victory from defeat's jaws, looking for other means to corner televised live sports for itself.

70.     On August 21, 2025—a little over one year after the *Fubo* court blocked the launch of Raptor/Venu—Disney and Fox simultaneously launched their own direct-to-consumer sports packages: Disney's ESPN division unveiled a premium streaming product, ESPN Unlimited, that, for the first time, gives subscribers access to *all* of ESPN's linear TV networks—including ESPN, ESPN2, ESPNU, SEC Network, ACC Network, ESPN Deportes, and even the sports broadcasts on ABC—plus the ESPN+ catalog and other digital features.  At the same time, Fox debuted "FOX One," a direct-to-consumer streaming app that provides access to all of Fox's sports networks, including the Fox local broadcast stations, FS1, FS2, Fox Deportes, and B1G (the Big Ten Network).

71.     More concerningly, soon after launching their standalone services, Disney and Fox announced a partnership to bundle ESPN Unlimited and FOX One, reuniting their sports

---

[12] Letter from Pantelis Michalopoulos, Counsel for EchoStar Corporation, to Judge Margaret Garnett, *FuboTV v. Walt Disney Co.*, No. 1:24-cv-01363 (Jan. 7, 2025) (ECF No. 377) (citing *Manufacturers Hanover Tr. Co. v. Yanakas*, 11 F.3d 381, 384 (2d Cir. 1993)).
[13] Kevin Draper, *Sports Streaming Service from Media Giants Ends Before It Starts*, N.Y. Times (Jan. 10, 2025), https://www.nytimes.com/2025/01/10/business/venu-sports-streaming-service.html.

content in a single offering to consumers that approximates the anticompetitive Raptor/Venu joint venture. In August 2025, Disney and Fox revealed an agreement to offer the two new services as an integrated package at a discounted price.[14] The new ESPN/FOX One bundle gives viewers the option to subscribe to both ESPN Unlimited and FOX One for a combined $39.99 per month. This bundled price (roughly $10 less than buying each service separately) aims to entice sports fans to sign up for "all-you-can-watch" access to both companies' live sports lineups.

72.    The ESPN/FOX One bundle is largely Raptor/Venu redux. As Fox's bundle announcement boasted, a customer who purchases the ESPN/FOX One bundle can watch an "incredible portfolio of content" spanning "NFL, NBA, WNBA, MLB, NHL, College Football and Basketball, NASCAR, INDYCAR, UFC," plus events like the FIFA World Cup. The portfolio was, and is, "incredible" because Disney and Fox prevent other distributors from replicating it, by, among other things, requiring their non-sports content to be packaged with their sports content.

73.    Indeed, Disney and Fox did not even bother to hide the striking parallels between Raptor/Venu and the ESPN/FOX One bundle: Front Office Sports reported that Fox hired former Raptor/Venu CEO Pete Distad to be the CEO of FOX One and repurposed Raptor/Venu's technical groundwork for its new service.[15] The ESPN/FOX One bundle is even priced similarly to Raptor/Venu—roughly $40 per month, only slightly below Raptor/Venu's $42.99 price point.

---

[14] Press Release, Fox Corporation, *ESPN DTC and FOX One to Launch Combined Bundle Offer* (Aug. 11, 2025), https://www.foxcorporation.com/news/business/2025/espn-dtc-and-fox-one-to-launch-combined-bundle-offer/.

[15] Eric Fisher, *New ESPN-Fox Bundle Revives Venu Sports Concept*, Front Office Sports (Aug. 11, 2025), https://frontofficesports.com/new-espn-fox-bundle-revives-venu-sports-concept/.

74.     In short, even without a formal joint venture entity—a cosmetic differentiation from Raptor/Venu—Disney and Fox each control a lion's share (and, together, the lion's pride's share) of must-have sports programming—and now they are jointly marketing those assets as one package, tightening their grip on sports distribution.

75.     Competing TV providers still must negotiate carriage deals for ESPN, and they must contend with the fact that Disney is now collaborating to siphon sports audiences to their own DTC platforms. This raises the same specter of "market foreclosure" that concerned the *Fubo* court: Disney has enhanced incentives to favor its own bundle and "suppress other potential sports-focused bundles from meaningfully competing."

76.     The ESPN/FOX One bundle also creates the same danger of coordinated price increases and consumer harm that the *Fubo* court recognized. The bundle's current price is marketed as a limited-time deal, and there is nothing preventing the two firms from hiking the bundle's price or increasing their individual service rates in parallel once subscribers are on board (Raptor/Venu's internal plans for 10% yearly price hikes illustrate that risk).

**E.  Disney's Third Attempt to Corner Televised Live Sports: Using Fubo as a Trojan Horse to Relaunch Raptor/Venu as "Fubo Sports"**

77.     The ESPN/FOX One bundle is just one of two Disney efforts to revive Raptor/Venu after that first attempt was ostensibly abandoned. On September 2, 2025, Fubo launched a skinny sports bundle called "Fubo Sports." That was seven days after Disney filed its complaint against DISH in this proceeding, and while Disney and Fubo were still supposedly independent entities. At $55.99 per month, Fubo Sports gives consumers access to the sports content of Disney, Fox, and CBS, including ABC, CBS, FOX, ESPN, ESPN2, ESPN News, ESPNU, ACC Network, Big 10 Network, SEC Network, FS1, FS2, CBS Sports Network, Fubo Sports Network, ION, NFL Network, Tennis Channel, and ESPN+. Crucially, consumers are not

forced to subscribe to and pay for additional unwanted non-sports programming, with the exception of the popular Fox News and Fox Business. DISH cannot offer a similar skinny sports package, let alone offer those networks at the same low price, principally due to Disney's bundling, penetration, and packaging requirements. Disney did not waste time in buttressing the new bundle and preempting would-be competitors. On September 3, 2025, one day after launching Fubo Sports, Disney informed DISH that it would discontinue ESPN3.

78.    Fubo Sports and Raptor/Venu are strikingly similar in their network offerings. Raptor/Venu would have included most of the networks that Fubo Sports now offers: ABC, FOX, ACC Network, Big 10 Network, SEC Network, ESPN, ESPN2, ESPN News, ESPNU, FS1, and FS2. There are only three real differences—(1) Fubo Sports includes CBS's valuable sports networks, which Raptor/Venu did not; (2) Fubo Sports lacks WBD networks, which Raptor/Venu would have carried, probably because WBD no longer holds valuable NBA rights as of November 18, 2024; and (3) Fubo Sports includes Fox News and Fox Business, which Raptor/Venu would not have included.

79.    Fubo Sports is *only* possible because of Disney's acquisition of a controlling stake in Fubo and the amended programming licensing agreements that Disney and Fox granted Fubo as part of the *Fubo* settlement. As Fubo's president explained upon announcing the settlement, "Fubo will now be able to provide even more sports including ESPN Plus through amended distribution agreements with Disney as well as Fox and crucially Fubo has the potential to create skinnier sports . . . bundles according to consumer needs." "Crucially" indeed. In particular, the immediately effective amended carriage agreement with Disney "enable[s] [Fubo] to deliver flexible innovative and competitive content packages to consumers, particularly around sports."

In the same announcement, Fubo's chief financial advisor hinted that it might secure more amended programming licensing agreements within the year.

80.     That hint quickly turned prescient, as Fubo Sports also secured an amended programming licensing agreement from CBS, allowing it to offer unbundled CBS content as well.  CBS did not participate in Raptor/Venu, and its inclusion in the Fubo Sports package is the reason why Fubo Sports commands even more critical sports content than Raptor/Venu did.  Disney had never before extended these rights to any other distributor apart from the preliminarily enjoined Raptor/Venu.

81.     The near-contemporaneous concessions to Fubo by Disney and Fox after decades of resistance strongly indicate that their conduct was not independent, but rather the product of concerted action intended to replicate and amplify the anticompetitive effects of the enjoined Raptor/Venu.

82.     Each programmer's participation was economically rational only if the others also agreed to supply their critical sports content to Fubo Sports and to withhold comparable unbundled rights from competing distributors.  Absent the agreement, the must-have content of each participant would have been crammed with tied non-critical content of the other two, forfeiting the singularity that seems to be the Fubo Sports *raison d'être*.  For Raptor/Venu to become possible, it took an agreement of all participants there—Disney, Fox, and WBD, another strong indication that the sports-richer Fubo Sports skinny bundle sprang to life thanks to the coordination among *its* participants.

83.     In short, Disney's acquisition of Fubo is a Trojan horse for reintroducing Raptor/Venu.  The only skinny sports bundles today are Disney's Fubo Sports, Disney's and Fox's ESPN/FOX One Bundle, Disney's ESPN Unlimited, and Fox's FOX One.  Unlike Disney

and Fox, CBS does not offer its own direct-to-consumer sports-only streaming service; unbundled CBS sports content is only available through Fubo Sports. And neither DirecTV's MySports nor Comcast's Xfinity Sports & News TV is a substitute for programmer-led skinny sports bundles. They are both priced substantially higher, at $70 or more per month, and have far more networks than the Disney- and Fox-owned skinny bundles, probably because Disney and Fox force them to carry a multiplicity of networks.

84.    Disney commands the lion's share, certainly more than 50%, of skinny sports bundle viewership.

85.    Meanwhile, Fubo posted its best third-quarter result in company history for Q3 2025, gaining an estimated 275,000 subscribers, some of whom are assuredly Fubo Sports customers.[16] This is the first quarter in which customers could subscribe to Fubo Sports.

86.    Fubo Sports is not just a Raptor/Venu rerun. It is even more destructive to competition in light of the higher quality of its sports content. Given WBD's loss of NBA content, and CBS's valuable NFL games, CBS has a stronger portfolio of sports content than WBD. It is not surprising that, upon the closing of the Disney acquisition, the Fubo CEO praised the transaction by citing the enormous leverage endowed to Fubo by ESPN: "ESPN's ecosystem of ESPN Radio, ESPN.com, flagship and other spokes that they have within that ESPN flywheel probably averages somewhere in the sort of 100 million monthly active users. This is a funnel that we have never leveraged before. So we think that there's probably significant untapped

---

[16] Press Release, Fubo, *Fubo Powers Through Q3 2025 with Strong Growth in Subscriber and Profitability Metrics* (Nov. 3, 2025), https://ir.fubo.tv/news/news-details/2025/Fubo-Powers-Through-Q3-2025-With-Strong-Growth-in-Subscriber-and-Profitability-Metrics/default.aspx ("Notably, the subscriber result was Fubo's highest for a third quarter in the Company's history."); Luke Bouma, *Fubo Added Over 275,000 Subscribers in the 3rd Quarter of 2025*, Cord Cutters News (Nov. 3, 2025), https://cordcuttersnews.com/fubo-added-over-275000-subscribers-in-the-3rd-quarter-of-2025/.

value for us to grow our sub base again profitably, which means it could have a very positive

impact on our sales and marketing line."[17]

## VI.    DISH AND SLING CANNOT COMPETE EITHER WITH THE ESPN/FOX ONE BUNDLE OR WITH FUBO SPORTS

87.    As a result of the high content costs and straitjacket packaging requirements

imposed by Disney's policies, DISH is forced to charge a price significantly higher than the

prices for either the ESPN/FOX One bundle or Fubo Sports streaming services.  For example,

both Sling Orange (which includes ESPN but not Fox networks) and Sling Blue (which includes

Fox but not ESPN networks) are priced at $45.99 per month, compared to $39.99 for the

ESPN/FOX One bundle, which includes all Disney *and* Fox sports content.  In fact, to get even

close to the same sports networks that the ESPN/FOX One bundle has, Sling customers would

have to subscribe to the even more expensive Sling Orange + Blue offering that combines the

two offerings for $60.99 to $65.99 per month, depending on whether the market has local ABC,

NBC, and FOX broadcast stations included.  Even then, customers could only access ESPN on

one television set or device at a time.  This is in stark contrast to the multi-view capabilities of

ESPN Unlimited, which permits the viewing of up to three streams.  Fubo Sports, of course,

carries Disney's, Fox's, *and* CBS's sports content for $55.99 per month.  Sling Orange + Blue

does not have CBS, meaning that Fubo Sports has more sports for less than the price of Sling

Orange + Blue.  And, as sports fans defect from DISH and Sling to Disney's skinny sports

offerings, the remaining, less avid sports watchers will still have to pay for sports because of the

bundling, penetration, and packaging requirements that Disney imposes on DISH.

---

[17] *Fubo TV Q3 2025 Earnings Call Transcript*, Fidelity (Nov. 3, 2025), *available at*: https://www.fidelity.com/news/article/default/202511031214BENZINGAFULLNGTH48597827.

88.     The Fubo Sports bundle increases Disney's incentive to impose tying restrictions on DISH—restrictions that exclude competition from the Skinny Sports Bundle Market.

89.     Disney now smells blood in the water, and is acting as a Raptor in response, working to destroy DISH in other ways, too.  First, Disney is withdrawing some of its valuable sports content from DISH.  On Tuesday, December 2, 2025, ESPN discontinued ESPN3, a network popular with Sling Orange subscribers, even as the content previously on that network will be available for subscribers to ESPN's direct-to-consumer offerings, including the ESPN/FOX One bundle.

90.     What is more, Disney has threatened to make changes that implicate the delivery of the companion products to two premier college sports networks included in the ESPN/FOX One bundle—the ACC Network and SEC Network; this would make it technically impracticable for DISH to continue distributing the full portfolio of content under the ACC Network and SEC Network umbrellas.  Those changes would breach the OTT License.

91.     Disney also continues to block distributors from introducing their own consumer-friendly innovations.  Disney's filing of this lawsuit seeking to enjoin Sling Passes is a case in point.  Not willing to tolerate even the slightest threat to its effort to dominate the distribution of live sports programming, Disney filed this retaliatory lawsuit based upon supposed violations of the OTT License.

92.     DISH is irreparably injured by Disney's conduct.  Both Disney's tying requirements, and its creation of smaller packages free of such requirements, directly and proximately result in the loss of DISH and Sling customers and goodwill, and are making it harder for DISH and Sling to attract and retain customers.  These injuries are not adequately compensable with money damages alone.

93.     The Court's intervention is needed to forestall the harm to competition that Defendants' conduct threatens.

## VII.    RELEVANT PRODUCT MARKETS AND MARKET POWER

94.     There are multiple relevant product markets in the pay television ecosystem. *First*, there is an upstream market for licensing linear television networks that focus on valuable live sports content to Pay-TV Distributors—the upstream national "Sports Programming Market." *Second*, there is a downstream market in which Pay-TV Distributors deliver television content to consumers through multichannel packages that include a wide range of content (including sports as well as general entertainment, news, and many other genres)—the "Live Pay-TV" market. *Third*, there is the new market for television packages that focus on live sports—the "Skinny Sports Bundle" market.

### A.  Sports Programming Market

95.     DISH is a direct purchaser in the upstream Sports Programming Market.

96.     As set forth above at ¶¶ 41–54, Disney has substantial market power in the Sports Programming Market.  That market power is only slated to grow with Disney acquiring additional NFL rights if antitrust regulators clear Disney's acquisition of the NFL Network and the rights to distribute and negotiate on behalf of the NFL Redzone network.

97.     In terms of viewership, Disney controls 36% of the Sports Programming Market, and more than 57% of that market together with Fox.[18]  High barriers to entry protect Disney's substantial market power in that market.  For example, the total value of the NFL's recent rights deals is more than $110 billion over eleven years.  The new NFL deal lasts for a decade, meaning that its rights will not be available to any new programmers until 2033 (subject to opt-out options

---

[18] DISH has calculated these market shares using Nielsen viewership data and based on Disney's public claims about ESPN's 36% viewership share, as set forth above at ¶ 54.

the NFL can exercise in 2029 and 2030). And the NBA has recently signed a new 11-year rights deal with Disney worth more than $76 billion; the MLB has also signed a 3-year deal with Disney averaging $550 million per year. Barriers of that magnitude preclude all but the largest media giants from entering the market.

### B. Markets for Distributing Live Sports Content to Customers

#### 1. Live Pay-TV Market

98.     As noted above, downstream from the Sports Programming Market, another relevant market is the Live Pay-TV market for distributing live sports programming to consumers as part of a multichannel package. The Live Pay-TV market includes all Pay-TV Distributors—both traditional MVPDs (such as DISH, Comcast/Xfinity, Charter/Spectrum, and Verizon Fios) and OVDs (such as Sling TV, YouTube TV, and Hulu + Live TV).

99.     Both MVPDs and OVDs sell multichannel packages that include live events, allowing users to watch time-sensitive programming (such as sporting and breaking news events) as it occurs. They can offer that programming only as part of a bundle that also includes non-sports programming (because they must under their programing carriage agreements with Disney and others). Disney now seeks to upend that paradigm to its advantage, by dominating a new market that many Pay-TV Distributors have vainly sought to enter and offering the ESPN/FOX One bundle without substantial non-sports programming.

100.    Critically, both MVPDs and OVDs rely on live sports as the key factor differentiating them from SVOD streaming services, such as Netflix. For America's many millions of sports fans in particular, Live Pay-TV services are not reasonably interchangeable with SVOD services.

101.    For these reasons, a hypothetical monopolist of the Live Pay-TV market could profitably impose a small but significant, non-transitory price increase or quality reduction.

2. *Skinny Sports Bundle Market*

102.    As mentioned, another relevant market is the Skinny Sports Bundle Market for television packages focused on live sports.  Skinny sports bundles are multichannel video programming packages (delivered through cable, satellite, or the Internet) focused almost exclusively on a substantial and distinctive lineup of live sports networks available on a standalone basis.  These bundles offer consumers reliable access to major professional and collegiate sporting events and related sports programming and are marketed, priced, and purchased primarily based on that sports content.

103.    The Skinny Sports Bundle Market includes Disney's ESPN Unlimited streaming service, Disney's Fubo Sports, Disney's and Fox's ESPN/FOX One bundle, and Fox's FOX One.  That is it.

104.    But for Disney's and Fox's anticompetitive bundling arrangements, DISH would offer a more sports-heavy package of networks, devoid of the non-critical non-sports Disney networks, that would compete in the Skinny Sports Bundle Market.

105.    Traditional television packages offered by Pay-TV Distributors, which typically include dozens or hundreds of non-sports networks, are not substitutes for skinny sports bundles. Because these traditional TV packages include both sports content and substantial amounts of non-sports content, they are generally priced significantly higher than the skinny sports bundles. For example, the base plans for YouTube TV and Hulu + Live TV all start around $85 per month—significantly higher than the $20-40 price points of the skinny sports bundles offered by Disney and Fox.

106.    Single-sport streaming services offered directly to consumers by sports leagues— such as NFL Sunday Ticket or NBA League Pass—are likewise not close substitutes for skinny sports bundles.  These single-sport streaming services offer access to live sports from only a

single sports league, and generally only out-of-market games, not the variety of games, including

those of the home NFL, NBA or NHL teams, necessary to satisfy the demand of most sports

fans.  Local or team-specific streaming services such as Gotham Sports (YES Network plus

MSG) are too specialized to be a real substitute either.  These niche services are, therefore, at

most a complement to, not a substitute for, the breadth and diversity of premier sporting events

available through skinny sports bundles.

107.    ***Industry and public recognition***:  Industry participants recognize that bundles of

live sports constitute a distinct market.[19]  Industry participants separately describe and analyze

market shares for live sports networks.[20]  Likewise, the public recognizes live sports as distinct

from broader packages of programming content offered in the Live Pay TV market.  In 2020, for

example, analysts at MoffettNathanson described the "separation of sports and entertainment" in

television markets.[21]

108.    ***Distinct customers***:  Live sports customers tend to be significantly younger, on

average, than traditional cable and satellite customers.[22]  Live sports customers also tend to

---

[19] *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1155 (9th Cir. 2019) (recognizing a "market for live video presentations of regular season NFL games"); *United States v. The Walt Disney Co.*, No. 18-cv-5800, (S.D.N.Y 2018), Doc. 21, Competitive Impact Statement (S.D.N.Y. filed Aug. 7, 2018) at 5 (noting that "MVPDs could not attract or retain those consumers as subscribers without including cable sports programming in the packages of cable programming networks they offer their subscribers.").

[20] *See United States v. The Walt Disney Co.*, No. 18-cv-5800, Doc. 21, Competitive Impact Statement (S.D.N.Y. filed Aug. 7, 2018) at 6-7 (finding "Disney's networks would account for at least 60 percent of cable sports programming in 19 of the DMA Markets and over 45 percent in the remaining six DMA Markets."); *Sports Streaming Platforms Market Report 2025 | Revenues to Reach USD 75.17 Billion by 2030*, Yahoo! Finance, (Aug, 15, 2025) https://finance.yahoo.com/news/sports-streaming-platforms-market-report-082500684.html.

[21] Ashley Rodriguez, *A New Wave of Cord-Cutters Is Leaving Cable and Satellite TV for Good and Experts Say It's Sending the Pay-TV Bundle into a 'Death Spiral'*, Business Insider (May 9, 2020) https://www.businessinsider.com/pay-tv-subscriber-losses-rise-sending-the-bundle-death-spiral-2020-5.

[22] *Disney, Fox, Warner Bros Discovery Sports-Streaming Venture Named Venu Sports*, Reuters, (May 16, 2024) https://www.reuters.com/sports/disney-fox-warner-bros-discovery-sports-streaming-venture-named-venu-sports-2024-05-16/ ("Announced in February, [Venu] will try to woo younger viewers who are not tuned in to cable TV.").

consume live television from phones, tablets, gaming consoles, and computers, not just from stationary television sets.[23] Distinctively, live sports customers are sports fans, who are unwilling to give up access to live sports.

109.    ***Distinct prices***: The four existing skinny sports bundles are priced considerably lower than MVPD and OVD services.

### C.  Relevant Geographic Markets

110.    The relevant geographic market is the United States.

111.    Sports leagues such as the NFL, NBA, MLB, NHL, and PGA Tour sell media rights to their events for the United States separately from international media rights.

112.    In turn, programmers such as Disney license the United States distribution rights to their sports programming to pay TV distributors such as DISH.

113.    The Pay-TV Distributors similarly compete, by and large, throughout the United States.  Specifically, satellite MVPDs such as DISH and DirecTV and OVDs tend to operate nationally.  While cable and telephone MVPDs operate regionally, national distributors typically face competition from a cable company and/or telephone company in most areas.

114.    Likewise, the ESPN/FOX One bundle is offered in the United States (not internationally) and tailored to United States customers.  The same is true of Fubo Sports.

### D.  Tying and Tied Products

*1.  Tying Product: Commercially Critical Sports Networks*

---

[23] Press Release, Capgemini, 69% of Fans Prefer to Watch Sports Outside the Venue, Especially Younger generations, (June 6, 2023), https://www.capgemini.com/news/press-releases/69-of-fans-prefer-to-watch-sports-outside-the-venue-especially-younger-generations/.

115.    The tying product consists of commercially critical sports networks in the United States—programming that an MVPD or OVD *must* license to offer a commercially viable offering.

116.    Live sports are critically important to MVPDs and OVDs.  Although consumers have time-shifted their entertainment viewing habits—so that they increasingly watch scripted shows and movies through video-on-demand services—they continue to watch sports live. According to a recent S&P Global report, 81% of traditional pay TV subscribers, and 74% of virtual multichannel TV service households, watch live sports.[24]  Accordingly, high-quality sports content is more critical than ever to the survival of Pay-TV Distributors.

117.    The commercially critical nature of Disney's sports programming is also evidenced by its cost. ██████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████ ███████████████████ To comprehend the magnitude of this wholesale fee, it is close to the retail fee Netflix charges a household. █████████████████████████████████ ███████████████████████████ On top of these prices, of course, Disney can, and does, force DISH to carry non-critical, non-sports networks like ███████████████████████ █████████████████████████████████████████████████ ████████, at rates disproportionately high relative to their viewership, and to carry them on a

---

[24] Keith Nissen, *Sports Play a Vital Role in All Video Services, Especially Traditional Pay TV*, S&P Global (Dec. 17, 2025).

high-penetration package, because Disney makes their carriage a condition of access to Disney's must-have sports.

118.    High barriers to entry protect Disney's and Fox's market power in the tying market.  Developing a commercially critical sports network requires obtaining the locked-up-for-years media rights to major sports leagues and events, a dauntingly difficult project.

### 2.  Tied Product: Non-Critical Television Networks

119.    The tied product is the licensing of non-critical television networks in the United States—programming that an MVPD or OVD *might* choose to license for distribution in a given package of networks, but that it does not *need* to license to support a commercially viable package of networks.

120.    Non-critical television networks compete in markets defined by various non-sports programming genres.  They are reasonably interchangeable within a genre because distributors (absent tying and bundling policies) could choose between non-critical television networks of the same genre when offering a multichannel package to consumers.  For example, absent contractual restrictions, DISH and other Pay-TV Distributors could ████████████

████████████████████████████████████████████████████████████

████████████████████████.  However, non-critical television networks are *not* reasonably interchangeable with commercially critical sports networks.

121.    Disney forces DISH to accept many non-critical television networks as a condition to receiving the commercially critical sports programming.  For example, as stated, depending on the platform and package, Disney forces DISH to license ██████████████

████████████████████████████████████████████████████████████

████████████████.  Each of the Sling Orange, Sling Blue, and Sling Select offerings include

some of these non-critical television networks even though they receive relatively little viewership.

122.    Disney's tying policies have restricted DISH's ability to offer consumers affordable packages consisting of the networks they most desire and has prevented other programmers' networks in various genres from competing against Disney's networks.  Both Football Frank and Sitcom Sally have to overpay because Disney has crammed DISH's offerings with channels they do not want.  Both may leave DISH or Sling for that reason, and many like them do.  And, making the anticompetitive behavior sweeter for Disney, Football Frank is likely to end up with the ESPN/FOX One bundle or Fubo Sports, to Disney's further profit.

## VIII.    DISH HAS SUFFERED AND WILL SUFFER ANTITRUST INJURY

123.    The very characteristics of Disney's anticompetitive conduct that cause harm to competition have harmed DISH as well.  Disney's and Fox's ESPN/FOX One bundle will enable them to exercise their combined market power to exclude existing and potential competitors from competing in the Skinny Sports Bundle Market, including DISH.  And Disney's acquisition of Fubo allows Disney to dominate the Skinny Sports Bundle Market and exclude DISH from that market.

124.    As described above and in the following paragraphs, Disney's unlawful conduct has caused competitive injury to DISH by coercing DISH to license non-critical content on cumbersome terms in order to access Disney's commercially critical sports content.

125.    Disney ties its commercially critical sports content to the licensing of non-critical content.  Absent this tie, DISH would license only commercially critical content or would license far less non-critical content (by, for instance, placing critical sports content in its own packages, or by placing non-critical content in separate packages available to consumers who desire that content).  Instead, DISH is forced to pay for undesirable content and cannot customize packages

to meet the needs of consumers. Disney's unlawful tying arrangements thus degrade DISH's product quality, and cause DISH to lose customers, including to Disney's cheaper skinny sports bundles, which are not encumbered by these tying arrangements.

126.    The anticompetitive harm from Disney's conduct has only intensified. On December 10, 2025, YouTube TV announced that it will introduce a new standalone offering called "Sports Plan," a package centered almost entirely on live sports content that will provide subscribers access to major sports networks such as FS1, NBC Sports Network, the ESPN networks, and ESPN Unlimited, reportedly without any requirement that the distributor also carry non-critical, non-sports networks. YouTube TV's Sports Plan appears to be yet another skinny sports bundle that will compete directly in the Skinny Sports Bundle Market. YouTube TV, backed by its parent company Google, possesses sufficient countervailing bargaining power to avoid the contractual restraints that Disney imposes on smaller distributors like DISH and offer a sports-focused product that may secure entry into the very market Disney has prevented DISH from entering. The launch of Sports Plan further validates that the skinny sports bundle market is a commercially distinct one with robust consumer demand, which powerful distributors recognize and are using their leverage to try to enter. It also demonstrates that competitive harm from Disney's conduct is not theoretical: the market is expanding with new potential entrants even as DISH is still barred from participating in it because of Disney's anticompetitive restrictions. Nor does Google's future entry in the market dilute Disney's commanding market power in it. Rather, Disney's conduct further exacerbates DISH's competitive disadvantage and entrenches the anticompetitive conditions that foreclose DISH from the Skinny Sports Bundle Market.

127.    In short, Disney forces DISH to distribute non-critical content to significant numbers of DISH subscribers. Absent these tying restraints, DISH would structure its offerings

to provide affordable packages that include only the content its consumers actually want to watch. Instead, DISH (and its customers) pay inflated prices for packages with unnecessary content, not watched by the phantom subscribers on which DISH must still pay. Ultimately, of course, the customers foot the bill of the overpayments or leave DISH altogether.

## IX.    THE MOST FAVORED NATION TERMS IN THE DBS AND OTT LICENSES

128.    DISH executed the OTT License and the DBS License on November 23, 2022 for distribution of Disney television networks, each of which is effective as of October 3, 2022. The OTT and DBS Licenses are collectively referenced herein as the "Licenses."[25]

129.    The Licenses provide DISH with certain MFN protections. *See* Licenses § 9. Under these MFN provisions, Licensors must provide DISH with any "Material Terms" (as defined in the Licenses) provided to third-party Other Distributors that are more favorable than those offered to DISH. *See id.*

130.    Specifically, pursuant to the Licenses:



---

[25] Many of the terms in the Licenses are identical. When such identical terms are cited, the citation will be to "Licenses § __."

███████████████████████████████████████

131.    The "Term" is the time period between ███████████████████████████

███████████████████████████████████████

132.    "Material Term" is specifically defined under the Licenses.  It encompasses

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████

133.    Section ██████ and the definition of "Material Term" in the Licenses require ██

███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

134.    When DISH becomes entitled to an MFN Offer, Licensors are required to ██

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████

135.    The MFN offers ████████████████████████████████████

█████████████████████████████

████████████████████████████████████████



136.    DISH ███████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████

137.    The Licenses also contemplate ██████████████████████████
██████████████████████████████████████████████████████
███████████████████████████████████

138.    The Licenses ██████████████████████████████████
██████████████████████████████████████████████████████
███████████████████████████████████████
████████████████████

139. Consistent with Section █████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████

140. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████

## X.    LICENSORS' 2024 BREACH OF THE MFN PROVISIONS

141. The MFN provisions of the Licenses were triggered in 2024 by terms Licensors agreed upon with an Other Distributor.

142. Upon information and belief, █████████████████████ is that Other Distributor.

143. James Zasowski, Senior Vice President, Platform Distribution Strategy at Disney, sent Andrew LeCuyer, Senior Vice President, Programming at DISH, a letter dated March 8, 2024 enclosing certain MFN Offers as Annexes I and II. DISH received the letter on March 11, 2024.

144. On information and belief, Licensors ██████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████

145. In breach of the MFN provisions, Licensors did not ████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████

146.    In addition to being late, Offers 1 and 2 contained in Annex II were non-compliant with the MFN provisions in the DBS License.

147.    ███████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

148.    Offer 1 on its own would save DISH millions of dollars.

149.    ███████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

150.    Licensors attached four identical conditions to both Offers 1 and 2.

151.    Condition 1, ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████

152.    ████████████████████████████████████████████████████████

████████████████████████████████████████████████

153.    Condition 2, ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████

154.    ████████████████████████████████████████████████████████

████████████████████████████████████████████████████

155.    Condition 3, ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

156.    ████████████████████████████████████████████████████████

████████████████████████████████████████████████

157.    Condition 4, ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████

158.    ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

159.    DISH responded by letter dated May 21, 2024.  Dkt. 55-2.  DISH advised Licensors that Offers 1 and 2, and the associated Conditions 1 through 4, do not comply with the DBS License MFN provisions.

160.    Offers 1 and 2 in and of themselves violate the DBS License.  The DBS License provides for MFN protection ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████

161.    DISH further advised Licensors that Conditions 1 through 4 violate the DBS License by ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████

162.    ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

██████████████████████

163.   In accordance with Section ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████

164.   In addition to pointing out the flaws in Offers 1 and 2, DISH apprised Licensors of additional MFN Offers required pursuant to the DBS and OTT Licenses that Licensors had not extended. ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

165.   ████████████████████████████████████

166.   ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

167.   Licensors ignored DISH's May 21, 2024 letter.  Licensors were required to respond ████████████████████████████████████████████████

████████████████████████████████████████████████

168.   Licensors belatedly sent DISH a response on October 9, 2025, more than one year later, and only after DISH advised this Court that Licensors are in violation of their MFN obligations.  In their belated response, Licensors claimed, without any basis whatsoever, that they had no obligation to respond to DISH's May 21, 2024 letter.  Licensors also asserted that they had offered DISH ████████████████████████████████ which also is patently inaccurate.

169.    With respect to ████████████████████████████████████████ ████████████████████████, Licensors disingenuously claimed, in violation of the Licenses, that █████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

170.    At the time the Licenses were executed, ████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

171.    It is not unusual for Licensors to remove their networks from a distribution platform at the end of a contract term as a negotiating tactic, in order to exert leverage.  In fact, Licensors have done so at least *five times in the last four years*, removing their networks from YouTube TV in December 2021, DISH in October 2022, Charter in August-September 2023, DirecTV in September 2024, and YouTube TV in October-November 2025.  █████████████

████████████████████████████████████████

███████████████████████████████████

172.    Each of these takedowns was within Licensors' control.

173.    For example, at the time that Licensors removed their networks from DISH, the parties were actively engaged in renewal negotiations.  DISH reasonably expected Licensors to agree to an extension.  Licensors abruptly refused an extension, yanked the networks during a popular sports weekend, and aggressively encouraged DISH subscribers to leave.

174.    Licensors may not exploit their hardball negotiation tactics ██████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████

## XI.    LICENSORS' 2025 BREACHES OF THE MFN PROVISIONS

175.    The MFN provisions of the Licenses were triggered again in 2025 by contract terms Licensors agreed to with Other Distributors.

176.    James Zasowski, Executive Vice President, Platform Distribution Strategy at Disney, sent Andrew LeCuyer, Senior Vice President, Programming at DISH, a letter dated June 18, 2025 enclosing MFN Offers as Annex I.

177.    On information and belief, ██████████████████████████████

██████████████████████████████

178.    On information and belief, Licensors ██████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████

179.    In breach of the MFN provisions, Licensors did not ██████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████

180.    The June 18, 2025 letter contained ████ MFN Offers.  Offers 1, 2, 3, 4 and 9 breach the MFN provisions of the Licenses.

181.   Offer 1, ███████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████

182.   Offer 1, standing alone, would save DISH millions of dollars.

183.   Offer 2, ███████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████

184.   Offer 2, standing alone, would save DISH millions of dollars.

185.   Offer 3, ███████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

186.   Offer 3, standing alone, would save DISH millions of dollars.

187.   Offer 4, ███████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

188.   ████████████████████████████████████████████████

██████████████████████

189.   Licensors attached three identical conditions to each of Offers 1 through 4.

190.   Condition 1, ████████████████████████████████████████

███████████████████████████████████████████████████████

███████████

191. ████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████

192. Condition 2, ████████████████████████████████████

████████████████████████████████

193. Condition 3, ██████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

194. ████████████████████████████████████████

█████████████████████████████████

195. Offer 9, ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

196. Licensors attached multiple Conditions to Offer 9. Among other things, the

Conditions would require ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

197. DISH responded to the 2025 MFN Offer Notice on September 15, 2025. Dkt. 55-

3.

198. With respect to Offers 1 and 2, ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

199.    With respect to Offers 3 and 4, ██████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

200.    With respect to Offers 3 and 4, ██████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████

201.    With respect to Condition 3, DISH notified Licensors that ██████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████

202.    With respect to Offer 9, DISH notified Licensors that ██████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████

203.    ██████████████████████████████████████████████████████

████████████

204.    ████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████

205.    ████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████

206.    ████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████

207.    In addition to pointing out the flaws in Offers 1, 2, 3, 4 and 9, DISH apprised Licensors of additional MFN Offers required pursuant to the DBS and OTT Licenses that had not been extended.  ██████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████

208.    Licensors responded by letter dated October 9, 2025.  Dkt. 64-1.  Licensors refused to ██████████████████████████████████, in willful breach of their MFN obligations.

209.    Licensors also refused to provide DISH with revised MFN offers that ████████

████████████████████████████████████████████

██████████████████████████████

210.    Licensors furthermore refused to provide DISH with MFN offers █████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████

211.    ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████

212.    James Zasowski, Executive Vice President, Platform Distribution Strategy at
Disney, sent Andrew LeCuyer, Senior Vice President, Programming at DISH, a letter dated
December 17, 2025 enclosing MFN Offers as Annexes I and II.  These MFN Offers are non-
compliant with the OTT License and the DBS License, in breach of those agreements.

213.    Annex I contains a single Offer 1, ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████

214. ██████████████████████████████████████████
████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
███████████████████

215. █████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████
█████████████

216. In violation of the OTT License, Offer 1 ██████████████████████████
█████████████████

217. Licensors included two Conditions with Offer 1, ███████████████████████
███████████████

218. Condition 1 relates to ██████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████

219. ███████████████████████████████████████████

███████████████████████████████████████

220. Condition 2, ████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████

221. Condition 2, ████████████████████████████████

████████████████████████████████████████████████

█████████████████████

222. Annex II contains 3 DBS MFN Offers.

223. Offer 1, ████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████

224. Offer 1, standing alone, would save DISH millions of dollars.

225. Offer 2, ███████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████

226. Offer 3, ████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

227.    Offers 1, 2 and 3 are all subject to the same three Conditions.

228.    Condition 1 ██████████████████████████████████████

██████████████████████████████████████████████

██████████

229.    In violation of the DBS License, ████████████████████████████

████████████████████

230.    Condition 2 █████████████████████████████████████

██████

231.    █████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████

232.    Condition 3 requires DISH to ████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████

233.    █████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████

234.    DISH ███████████████████████████████████. DISH's response to Mr. Zasowski's December 17, 2025 letter is not yet due. DISH intends to provide a written response on or before the due date.

## XII.    LICENSORS' OTHER MFN PROVISION BREACHES

235.    Licensors violated the MFN provisions in the Licenses by failing to make MFN Offers to DISH in connection with ████████████████████████████████ ████████████████████████████████████████ ███████████

236.    Upon information and belief, ████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████

237.    Upon information and belief, Licensors have taken other improper actions in violation of DISH's MFN rights. ██████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ██████████████████████████████████

238.    Licensors' other MFN breaches have caused DISH millions of dollars in damages.

## COUNT I
### Unlawful Tying in Violation of the Sherman Act, 15 U.S.C. § 1
### (against Disney)

239.    DISH repeats and realleges the allegations set forth above as if fully set forth herein.

240.    In its carriage agreements with DISH, Disney has conditioned the licensing of its commercially critical sports content—the linear ESPN networks—on DISH's agreement to license its non-critical content as well.  Disney also requires DISH to distribute this non-critical content to an unreasonable number of DISH's subscribers—an obligation Disney itself does not share or impose on its own affiliated ESPN/FOX One bundle.

241.    Disney's commercially critical sports networks and its non-critical television networks are distinct products that exist in separate markets.  As the exclusive owner of must-have sports content, Disney has market power in the market for licensing commercially critical sports networks.  Disney milks that market power to force DISH to purchase networks it does not want, or would only be willing to pay less for, and offer to fewer customers, but for the tie.

242.    Disney's ties affect a substantial amount of interstate commerce in the markets for the tied products, resulting in hundreds of millions of dollars per year in excess fees on DISH customers.

243.    Disney's tying arrangement is unlawful *per se*.  In the alternative, Disney's tying arrangement unreasonably restrains trade.

244.    Because of its bundling requirements, Disney charges higher prices for its non-critical content than it otherwise could.  Absent Disney's bundling requirements, DISH would license and broadcast superior non-critical content from other programmers.  DISH also has lost sales that it would otherwise have been able to make if Disney's unlawful bundling did not prevent it from offering skinnier packages to consumers and from providing superior content

from vendors unaffiliated with Disney.  Disney's tying has displaced other programmers' content to their and DISH's mutual detriment.

245.    As a result of Disney's bundling practices, DISH has suffered injury and damages that flow from Disney's antitrust violations.

## COUNT II
### Unreasonable Restraint of Trade in Violation of the Sherman Act, 15 U.S.C. § 1 (against Disney)

246.    DISH repeats and realleges the allegations set forth above as if fully set forth herein.

247.    Disney is a corporation engaged in interstate trade and commerce throughout the United States.

248.    On or about October 2, 2025, Disney and Fox launched a joint streaming deal, through which they will consolidate their sports content rights and offer that combined content to consumers through a jointly priced streaming service.

249.    The ESPN/FOX One bundle substantially affects interstate commerce as it is likely to draw tens of thousands of subscribers to Disney and generate millions, if not billions, of dollars nationally in annual revenue.

250.    Defendants, together with Fox, control a majority of U.S. sports broadcasting rights (measured by viewership) and therefore have substantial market power in the Sports Programming Market.  Disney and Fox currently own the media rights to a broad cross-section of commercially critical sports programming, including the NFL, NBA, MLB, NHL, FIFA World Cup, and many others.

251.    The Sports Programming Market is concentrated and barriers to entry and expansion are high.

252.    Among other things, the ESPN/FOX One bundle will substantially increase Disney's incentives to raise prices or entirely foreclose commercially critical sports networks in licensing negotiations with third-party distributors including DISH—causing them to pay supra-competitive carriage rates or driving them out of business altogether and harming the millions of American consumers who use those services.  It will also raise Disney's incentive to tighten further the penetration and packaging conditions upon which Disney provides its critical sports networks to others, all in order to make entry into the Skinny Sports Bundle Market even harder.

253.    Disney cannot show that any pro-competitive benefits resulting from its agreement with Fox will outweigh these anticompetitive effects.

254.    As a result of the ESPN/FOX One bundle, DISH has suffered and will suffer injury and damages that flow from Disney's antitrust violations.

## COUNT III
### Unreasonable Restraint of Trade in Violation of the Sherman Act, 15 U.S.C. § 1 (against Disney)

255.    DISH repeats and realleges the allegations set forth above as if fully set forth herein.

256.    Disney, through Fubo Sports, has coordinated conduct with horizontal competitors Fox and CBS to unreasonably restrain trade in the Skinny Sports Bundle Market.

257.    On information and belief, Disney and Fox each amended their carriage agreements with Fubo as part of the Raptor/Venu settlement, to permit the unbundled, sports-only distribution of their marquee sports networks—rights no programmer had ever before extended to any distributor that represented a departure from more than forty years of uniform bundling practices.  On information and belief, CBS also entered into a materially similar amendment to its carriage agreement with Fubo at some time after Disney's announcement to acquire Fubo.

258.    Moreover, each programmer's decision to distribute its marquee sports networks to Fubo Sports on an unbundled, discounted basis was only economically rational if in conjunction with the other programmers' nearly simultaneous concessions.

259.    For years, Disney adamantly refused to unbundle its sports networks.  Yet, shortly after the *Fubo* litigation settled, both agreed to unbundle them for Fubo's benefit.  This made no economic sense but for Fubo Sports' ability to create a near-unique product possible only through coordination.

260.    On information and belief, Disney commands 36% of sports viewership nationwide.  Disney and Fox together boast more than 57% of sports network viewership nationwide.  Disney has thus secured substantial market power in the upstream Sports Programming Market, which is concentrated and ring-fenced by high barriers to entry.  These companies currently own rights to a broad portfolio of commercially critical sports programming, including the NFL, NBA, MLB, NHL, FIFA World Cup, and many others.  The CBS sports portfolio on the CBS broadcast and cable networks adds even more to this commanding position.

261.    Among other things, Fubo Sports has substantially increased, and will substantially increase, Disney's incentives to raise programming prices or withhold critical sports networks in licensing negotiations with third-party distributors including DISH—causing DISH to pay supra-competitive carriage rates, keeping DISH out of the Skinny Sports Bundle Market, and harming the millions of American consumers who use those services.

262.    Thus, Disney's conduct has had and will continue to have substantial anticompetitive effects, including inducing less-rivalrous behavior on the part of leading sports programmers; foreclosing rival distributors from obtaining essential sports content on reasonable

terms and raising their costs; and reducing output, innovation, and consumer choice in the distribution of live-sports programming and in the provision of skinny sports bundles.

263.    Disney cannot show that any pro-competitive benefits resulting from Fubo Sports will outweigh these anticompetitive effects.

264.    As a result of Fubo Sports, DISH has suffered and will suffer injury and damages that flow from Disney's antitrust violations.

**COUNT IV**
**Violation of Section 7 of the Clayton Act, 15 U.S.C. § 18**
**(against Disney and Fubo)**

265.    DISH repeats and realleges the allegations set forth above as if fully set forth herein.

266.    Like Disney, Fubo is a corporation engaged in interstate trade and commerce throughout the United States.

267.    Disney acquired a controlling share of Fubo on October 29, 2025.  As a result, Disney acquired, directly or indirectly, shares of a business engaged in interstate trade and commerce throughout the United States.

268.    The transaction also combined Disney, the largest supplier of must-have sports programming in the United States, with Fubo, a major downstream distributor that competes directly against Disney's own distribution services.  By acquiring Fubo, Disney has vertically integrated across two essential levels of the content and distribution ecosystem—sports programming content and skinny sports bundles—and thereby eliminated Fubo as an independent competitive constraint on Disney in the distribution markets.

269.    Prior to the acquisition, Disney's ESPN Unlimited and Fubo's differentiated, sports-centric streaming service (although hobbled by restrictions on providing sports skinny bundles) competed directly for subscribers seeking live-sports-only packages.  By combining

two of the few nationwide distributors in this highly concentrated market, the transaction eliminated head-to-head rivalry, increased post-merger concentration to well above 30%, and reduced consumer choice, price competition, and service quality.

270.    Through its control of Fubo Sports, Disney has aligned the incentives of three of the largest sports programmers to restrict unbundled sports offerings from other competing distributors in the Skinny Sports Bundle Market.  Because the success of a skinny sports bundle depends on access to must-have sports networks, Disney's control of Fubo gives Disney an even greater incentive to impose bundling, penetration/pay-on, and packaging restrictions on distributors and a much greater ability to profit directly from these restrictions.  Essentially, by acquiring Fubo, Disney has set up shop to sell itself all the wares that it denies other shopkeepers.  These vertical effects foreclose rival distributors, raise competing distributors' costs, and entrench Disney's market power throughout the live-sports ecosystem.

271.    Both the upstream Sports Programming Market and downstream Skinny Sports Bundle Market are concentrated, and barriers to entry and expansion are high.  Rights to major sports leagues are locked into multi-year, multi-billion-dollar contracts held by few major programmers including Disney, Fox, and CBS.  No plausible new entrant can replicate those inputs in the foreseeable future.  The acquisition of Fubo further consolidates downstream distribution among those same incumbents.

272.    Disney and Fubo cannot show that any cognizable efficiency resulting from the acquisition is of a character and magnitude such that the acquisition is not likely to be anticompetitive.

273.    As a result of the acquisition, DISH has suffered injury and damages that flow from Disney and Fubo's antitrust violations.

## COUNT V
### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1
### (against Disney and Fubo)

274.    DISH repeats and realleges the allegations set forth above as if fully set forth herein.

275.    Disney and Fubo are corporations engaged in interstate trade and commerce throughout the United States.  Pursuant to an agreement, Disney acquired a controlling share of Fubo on October 29, 2025.

276.    The acquisition eliminated Fubo as an independent competitive constraint on Disney in the distribution markets, eliminated head-to-head rivalry between Disney and Fubo, and reduced consumer choice, price competition, and service quality.

277.    The acquisition constitutes an unreasonable restraint of trade in the relevant markets for Sports Programming, Live Pay-TV, and Skinny Sports Bundles in the United States.

278.    Disney and Fubo cannot show that any cognizable efficiency resulting from the acquisition is of a character and magnitude such that the acquisition is not likely to be anticompetitive.

279.    As a result of the acquisition, DISH has suffered injury and damages that flow from Disney and Fubo's antitrust violations.

## COUNT VI
### Attempted Monopolization in Violation of the Sherman Act, 15 U.S.C. § 2
### (Against Disney)

280.    DISH repeats and realleges the allegations set forth above as if fully set forth herein.

281.    As the exclusive owner of must-have sports programming, Disney possesses substantial market power in the Sports Programming Market.

282.    Disney has engaged in a pattern of exclusionary and anticompetitive conduct that leverages its power in the Sports Programming Market to entrench and expand its dominance in the Skinny Sports Bundle Market.  In its carriage agreements with DISH, Disney prohibits the offering of its critical sports content in a skinny sports bundle, creating an insurmountable barrier to entry in that market, in which the ESPN/FOX One bundle and Fubo Sports are now the commanding participants.

283.    Disney has reinforced its exclusionary strategy through a series of additional anticompetitive acts, including (a) entering into a horizontal agreement with Fox to launch the ESPN/FOX One bundle; (b) acquiring Fubo; and (c) seeking to acquire the NFL Network, further expanding its control over commercially critical sports content.

284.    As a result, Disney has achieved a dangerous probability of monopolizing the Skinny Sports Bundle Market, in which Disney and Fox are virtually the only participants.  In fact, Disney's effort is succeeding already.  On information and belief, Disney's market share in the Skinny Sports Bundle Market exceeds 50 percent, and competition is further weakened by Disney's coordination with Fox and CBS.

285.    Entry into the Skinny Sports Bundle Market is effectively foreclosed by high structural and contractual barriers.  In addition to the walls erected by the contractual restrictions on sports skinny bundles by Disney and its partners, the costs of acquiring sports rights—typically through multi-year, multi-billion-dollar contracts—further deter entry and entrench Disney's dominance.

286.    Disney has acted with specific intent to monopolize.  Despite this court's prior findings in *Fubo* that similar conduct would substantially reduce competition for Skinny Sports Bundles, Disney has pursued the same strategy again—replicating and expanding the very

structure the court previously enjoined.  Disney continues to weaponize its bundling practices and strategic acquisitions to dominate the market and exclude rival distributors such as DISH.

287.    DISH and Sling have suffered, and will continue to suffer, antitrust injury as a direct result of Disney's attempted monopolization.  Disney's anticompetitive conduct raises DISH's costs of obtaining essential sports programming, restricts DISH's ability to offer competitive packages, and forecloses DISH from effectively participating in the Skinny Sports Bundle Market.

### COUNT VII
### Unlawful Tying in Violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340
### (against Disney)

288.    DISH repeats and realleges the allegations set forth above as if fully set forth herein.

289.    Disney's unlawful tying arrangements, set forth in Count I of the Counterclaims, violate New York's Donnelly Act for the same reasons they violate federal antitrust law.

### COUNT VIII
### Breach of Contract—MFN Improper Bundling
### (against Licensors)

290.    DISH repeats and realleges the allegations set forth above as if fully set forth herein.

291.    DISH and Licensors are parties to the OTT License Agreement and the DBS License Agreement, which are valid, binding, and enforceable contracts.

292.    DISH substantially performed its obligations under the Licenses.

293.    Licensors breached the Licenses by improperly bundling Subscription Networks in their MFN Offers.

     a)  Offer 1: ██████████████████████████████████████
██████████████████████████████████████████████████;

b) Offer 2: 

c) Offer 1:

d) Offer 2:

e) Offer 3:

f) Offer 4:

g) Sling MFN Offer:

h) Offer 1:

i) Offer 2:

j) Offer 3:

294.     Licensors' improper bundling breaches have caused DISH millions of dollars in damages.

295.     Licensors' improperly bundling breaches have caused DISH competitive injury, by preventing DISH from offering consumers programming packages on terms as favorable as those DISH's competitors are authorized to offer.

296.    Licensors' improper bundling breaches were willful, deliberate, and in bad faith, undertaken with full knowledge of their contractual obligations.

## COUNT IX
## Breach of Contract—MFN Improper Tying of Unrelated Conditions
## (against Licensors)

297.    DISH repeats and realleges the allegations set forth above as if fully set forth herein.

298.    DISH and Licensors are parties to the OTT License Agreement and the DBS License Agreement, which are valid, binding, and enforceable contracts.

299.    DISH substantially performed its obligations under the Licenses.

300.    Licensors breached the Licenses by improperly tying unrelated conditions to their MFN Offers.

    a)  <u>For Offer 1:</u> ████████████████████
████████████████████████████
████████████████████████████
████████████████████████████

    b)  <u>For Offer 2:</u> ████████████████████
████████████████████████████
████████████████████████████
████████████████████████

    c)  <u>For Offer 1:</u> ████████████████████
████████████████████████



d) For Offer 2:

e) For Offer 3:

f) For Offer 4:

g) For Offer 9:

h) For Offer 1:

i) For Offer 1:



j) <u>For Offer 2:</u>

k) <u>For Offer 3:</u>

301.    Licensors' breaches by improperly tying unrelated conditions to their MFN offers have caused DISH millions of dollars in damages.

302.    Licensors' breaches by improperly tying unrelated conditions to their MFN offers have caused DISH competitive injury, by preventing DISH from offering consumers programming packages on terms as favorable as those DISH's competitors are authorized to offer.

303.    Licensors' breaches by improperly tying unrelated conditions to their MFN offers were willful, deliberate, and in bad faith, undertaken with full knowledge of their contractual obligations.

## COUNT X
## Breach of Contract—MFN Offers With Insufficient Detail
### (against Licensors)

304.    DISH repeats and realleges the allegations set forth above as if fully set forth herein.

305.    DISH and Licensors are parties to the OTT License Agreement and the DBS License Agreement, which are valid, binding, and enforceable contracts.

306.    DISH substantially performed its obligations under the Licenses.

307.    Licensors breached the Licenses by refusing to provide sufficient detail in the MFN Offers.  For example, ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████

308.    Licensors' breach in its refusal to provide DISH with sufficient detail for the MFN Offers has caused DISH millions of dollars in damages.

309.    Licensors' breach in its refusal to provide DISH with sufficient detail for the MFN Offers has caused DISH competitive injury, by preventing DISH from offering consumers programming packages on terms as favorable as those DISH's competitors are authorized to offer.

310.    Licensors' breach in its refusal to provide DISH with sufficient detail for the MFN Offers was willful, deliberate, and in bad faith, undertaken with full knowledge of their contractual obligations.

## COUNT XI
## Breach of Contract—███████████████████████████████
### (against Licensors)

311.    DISH repeats and realleges the allegations set forth above as if fully set forth herein.

312.    DISH and Licensors are parties to the OTT License Agreement and the DBS License Agreement, which are valid, binding, and enforceable contracts.

313.    DISH substantially performed its obligations under the Licenses.

314.    Licensors breached the Licenses by ████████████████████████████████████████████████████████



315.    Licensors' breaches ████████████████████████████████████ ████████████████████ have caused DISH millions of dollars in damages.

316.    Licensors' breaches  have caused DISH competitive injury, by preventing DISH from offering consumers programming packages on terms as favorable as those DISH's competitors are authorized to offer.

317.    Licensors' breaches  were willful, deliberate, and in bad faith, undertaken with full knowledge of their contractual obligations.

### COUNT XII
### Breach of Contract – Failure to Extend MFN Offers
### (against Licensors)

318.    DISH repeats and realleges the allegations set forth above as if fully set forth herein.

319.    DISH and Licensors are parties to the OTT License Agreement and the DBS License Agreement, which are valid, binding, and enforceable contracts.

320.    DISH substantially performed its obligations under the Licenses.

321.    Licensors breached the Licenses by failing to provide DISH with MFN Offers that they were obligated to extend pursuant to the MFN provisions.



a)

b)

c)

d)

322.    Licensors' breaches in their failure to extend required MFN Offers have caused DISH millions of dollars in damages.

323.    Licensors' breaches in their failure to extend required MFN Offers have caused DISH competitive injury, by preventing DISH from offering consumers programming packages on terms as favorable as those DISH's competitors are authorized to offer.

324.    Licensors' breaches in their failure to extend required MFN Offers were willful, deliberate, and in bad faith, undertaken with full knowledge of their contractual obligations.

## JURY DEMAND

DISH hereby demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, DISH respectfully prays as follows:

a)   That judgment be entered in favor of DISH and against Counterclaim-Defendants;

b)   That the Counterclaim-Defendants' conduct specified in these Counterclaims be declared by the Court to violate Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1; Section 7 of the Clayton Act, 15 U.S.C. § 18; and the Donnelly Act, N.Y. Gen. Bus. Law § 340;

c)   That an injunction be entered against the Counterclaim-Defendants, unwinding Disney's acquisition of Fubo, unwinding the ESPN/FOX One bundle, and prohibiting Defendants' tying and other anticompetitive actions;

d)   That judgment be entered for DISH against the Counterclaim-Defendants for three times the amount of money damages sustained by DISH with respect to Counts I–VII as allowed by law, together with the costs of this action, including reasonable attorneys' fees pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, and the Donnelly Act, N.Y. Gen. Bus. Law § 340;

e)   That money damages be awarded to DISH against Licensors according to proof with respect to Counts VIII-XII;

f)   That DISH be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of these Counterclaims to the extent provided by law; and

g) That DISH receive such other, further, or different relief as the case may require and the Court deems just and proper under the circumstances.

Dated: January 2, 2026
     New York, NY

**STEPTOE LLP**

By:    */s/ Elyse D. Echtman*

Pantelis Michalopoulos (*pro hac vice* to be filed)
Michael J. Allan
Michelle Kallen (admitted *pro hac vice*)
Matthew R. Friedman (*pro hac vice* to be filed)
Emma Marshak (admitted *pro hac vice*)
1330 Connecticut Ave NW
Washington, DC 20036
T: (202) 429-3000
pmichalopoulos@steptoe.com
mallan@steptoe.com
mkallen@steptoe.com
mfriedman@steptoe.com
emarshak@steptoe.com

Elyse D. Echtman
Michael Weiner
1114 Avenue of the Americas
New York, NY 10036
T: (212) 378-7551
eechtman@steptoe.com
mweiner@steptoe.com

*Attorneys for Defendant/Counterclaim-Plaintiff DISH Network L.L.C.*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 2, 2026, the foregoing was filed with the Clerk of Court for the United States District Court of the Southern District of New York using the CM/ECF system.

I further certify that I caused to be served on the following participants in the case via email an electronic copy of the sealed versions of the foregoing:

- Allen W. Burton, aburton@omm.com

- Daniel M. Petrocelli, dpetrocelli@omm.com

- Brian Quinn, bquinn@omm.com

- Heather Welles, hwelles@omm.com


*/s/ Elyse D. Echtman*
Elyse D. Echtman